Argued January 27, reversed March 8, petition to tax costs to
respondent denied April 12, 1921.

# In Re JOHNSON'S ESTATE.

## JOHNSON v. HELMER.

(196 Pac. 385, 1115.)

**Wills—Letter cannot be Considered as Part of a Will.**

1. Under Section 803, Or. L., declaring that a written will can-
not be revoked or altered otherwise than by another written will,
or another writing declaring such revocation and executed with the
formalities required of a will, and Section 10095, declaring that
every will shall be in writing and attested by two or more com-
petent witnesses, etc., a letter written by testator after the execu-
tion of his will cannot be considered as part of the will, though
it showed the testator's true intent and supplied omissions in the
original will.

**Wills—Will Executed by Testator in Contemplation of Suicide Held
not to Show His Desires.**

2. In view of letters and the surrounding circumstances, a will
executed by a testator in contemplation of suicide *held* not to show
his desires.

**Trusts—Property and Disposition must be Specified in Order for
Valid Trust to be Created.**

3. In order for a trust to be created, there must be an estate
to vest in the trustee, and the property must be definitely de-
scribed and the disposition definitely stated.

**Trusts—In Case of Uncertainty Trust must Fail.**

4. Where uncertainty as to the property or disposition exists, a
testamentary trust must fail, for the court cannot create a trust.

**Trusts—There must be Beneficiaries or the Trust will Fail.**

5. Unless there are competent and certain beneficiaries named or
described, a trust must fail.

**Trusts—Beneficiary Need not be Named if Identified.**

6. A testamentary trust will not fail where the beneficiary is
described with such accuracy that he may be identified.

**Wills—Intention of Testator may be Ascertained from the Whole
Will and Extrinsic Circumstances.**

7. The designation of a beneficiary of a trust, when ambiguity
exists, may be ascertained by inference from the whole will and
extrinsic circumstances.

---

1. For authorities discussing the question of sufficiency of letter
as will, see notes in 89 Am. St. Rep. 491; 15 L. R. A. 635; 17
L. R. A. (N. S.) 1126.

**Wills—Will cannot be Construed by Mere Conjecture.**

8.  A will cannot be construed by mere conjecture as to the intention of the testator, but the intention which the testator expresses controls.

**Charities—Purely Charitable Trust will be Sustained Though Beneficiaries are not Named.**

9.  A purely charitable trust will be sustained though no beneficiaries are named, because it derives its strength from the fact that its benefits are to be distributed among unknown persons.

**Charities—Trust not Sustainable as Charity "Benevolency."**

10.  Where a will gave all of the testator's property to a Swedish society, and the instrument did not use the word "charity" or "benevolent," the trust sought to be created cannot be upheld as a charitable trust, even though a letter showed that the testator intended his estate to be used for benevolent purposes, for "benevolency" is a much broader term than "charity," and includes objects and purposes not charitable.

**Wills—Proponent has the Burden of Proving Testamentary Capacity.**

11.  Where, after a will is probated in common form, its validity is attacked by direct proceedings, it is incumbent upon the person propounding the will to re-probate the same by original proof, as if no probate had been made, and hence the proponent has the burden of showing the testator's mental capacity.

**Trusts—Ordinarily Courts will not Allow Trusts to Fail for Want of Trustee.**

12.  Ordinarily the courts will not allow a trust to fail for want of a trustee.

**Wills—Where Trust Fails the Trustee cannot Take on Theory of Absolute Gift.**

13.  If a trust fails by lapse, or is condemned as illegal, a devise or bequest to a person merely by way of trust cannot be construed as an absolute gift.

**Wills—Petition of Contest may Waive Necessary Formalities Attending Probate.**

14.  A petition by way of direct contest after probate in common form may waive necessary facts and formalities attending probate.

**Wills—Petition of Contest Held to Raise the Question as to Beneficiary.**

15.  In view of the answer to the contest petition, *held* that the petition which denied that the instrument was the will of deceased, and that it was ambiguous, was sufficient to raise the contention that a trust sought to be created out of the decedent's property was invalid for want of a beneficiary.

---

9.  Certainty and unity required in charitable trusts, see note in 64 Am. St. Rep. 756.

11.  On burden of proof of testamentary capacity, see notes in 17 L. R. A. 494; 36 L. R. A. 733.

**Wills—Evidence Held to Show Decedent's Incapacity.**

16. In a will contest case evidence *held* to show the mental incapacity of decedent, who executed the will in contemplation of suicide.

### ON PETITION TO TAX COSTS TO RESPONDENT.

**Wills—*Ordinarily* Cost of Will Contest Borne by Estate.**

17. It is the common practice in proceedings for the contest of a will, especially where doubtful questions are settled, to provide that costs shall be paid from the proceeds of the estate.

**Wills—Cost of Contest Properly Ordered to be Paid Out of Estate.**

18. Where the executor, to whom letters testamentary were regularly issued, proceeding in good faith under what was presumed to be the will, husbanded the estate, and the heir at law, a resident of a foreign country, paid no attention to the property, costs of a contest wherein it was determined the will was invalid were properly ordered paid out of the estate.

From Multnomah: GEORGE TAZWELL, Judge.

Department 2.

This is a proceeding to contest the will of Michael Johnson, deceased. A decree was passed sustaining the will, and contestant appeals.

The will of Michael Johnson was admitted to probate in common form on September 10, 1918, and the testimony of the two subscribing witnesses was given in open court, reduced to writing, signed by them, attested by the judge presiding, and filed. Eric Helmer, named as executor in the will, was appointed executor, and qualified as such. On March 13, 1919, Elin Johnson, mother of Michael Johnson, a resident and inhabitant of the Kingdom of Sweden, by her attorney in fact, F. H. Whitfield, filed a petition and notice of contest, wherein contestant attacks the validity of said will on three grounds: (1) Unsound mind;

18. On *right of executor to allowance for attorneys' fees for services* rendered in attempt to establish or resist attack upon will, see notes in 26 L. R. A. (N. S.) 757; L. R. A. 1917A, 450.

On right of executor to an allowance for expenses incurred in unsuccessful attempt to uphold particular provisions of will, see note in 7 A. L. R. 1499.

(2) undue influence; (3) "After making said pretended will the same was and has been tampered with, parts of which are stricken out and other parts inserted after it was executed and witnessed, and thereby rendered void on its face; and that it should be discarded; that it is ambiguous and not the will of said deceased." The respondents filed their answer to the petition, denying all the matters alleged in it, as grounds for setting the will aside; and for a further and separate answer the respondents set forth the facts admitted in the answer; that Michael Johnson, on the date of the execution of the will, to wit, August 31, 1918, was of the age of forty-eight years, of sound mind, mentally competent to make his last will; that Eric Helmer was named as executor, and is competent; that the legatees under the will were Edward Johnson, to whom was bequeathed the automobile, Charles Ek, to whom was bequeathed the private library, and Swedish Society Linnea, to which was bequeathed the residue of the estate in trust; the probate of the will in common form, and the admission of the will to probate; that Michael Johnson disposed of his property in conformity with his own desire, was competent so to do, acted voluntarily, and was not influenced by anyone; that the erasure and annotation found on said will were made by Michael Johnson himself in his lifetime, and are immaterial and no part of the will, and do not affect its validity; and praying for the admission of said will to probate after due hearing, and that it be declared the last and only valid will of Michael Johnson, deceased.

The contestant thereafter filed the reply to the new matter, practically reiterating the allegations of the petition.

100 Or.—10

After first ordering his just debts and funeral expenses paid, the will reads thus:

"Second, I give and bequeath unto The Swedish Society, Linnea, all my property of which I die possessed in trust to be disposed of as follows,

"First, Said Society is to pay my funeral expenses and proper burial and after said debts are paid the said Society is to have and takes possession in trust for the Pearsons Fund, under their control all my other property except such as hereinafter mentioned, and the said property so devised in trust for the said Pearsons Fund is to be delivered under the care and jurisdiction of the said Swedish Society, Linnea.

"Second, I give and bequeath my automobile, ━━━━ ━━━━━━━━━━━━━━━━━━━━━━ save and except my books, all of which are now in the Evelein Appartment 21 and Northup streets, Portland, to my friend Edward Johnson, of Portland, Financial Secretary for the Swedish Society, Linnea, 860 Thurman St.

"Third, I give and bequeath to Charles Ek, my private Library now in my appartments above named, said Charles Ek lives at 860 Thurman Street, Portland, Oregon."

A printed form of will was used and filled out in typewriting. In the second clause there is a heavy dark line run through part of it with pen and ink. It was not stricken out when signed and witnessed and does not appear by whom it was done, probably by the decedent. After the typewritten portion above quoted there is another clause added in his handwriting to this effect:

"And I hereby ask that this package and letters be sent to those proper addresses that I have left here in my writing desk."

After the execution of the will, and apparently on the same day, the decedent wrote, in the Swedish language, a letter which is translated as follows:

"To the Swedish Society Linnea,
"Honored Brothers and Sisters:

"As my testament shows, I have left what I have to Linnea to be used for benevolent purposes. I wish Linnea gives me a decent funeral; that Linnea's members act as pallbearers. You can, of course, do as you please with my store, and what is in it, but I would propose Erick Helmer, Theodore Anderson and Waldemar Seton as trustees. I also wish you could sell the store on installments to Ed Johnson and Oscar Lindey, everything is paid for August, with the exception of some small bills for which I have not received statements.

"The rent I have also paid for September. There must be stock in store for six thousand dollars practically, or may be more. I also wish you would take two hundred and fifty dollars from my savings bank book and send that to my mother in Sweden. The address is Widow Elin Johnson, Lekare Killa Wirested, Sweden, and now at last I wish you all good luck and success. And may God bless you and make the society large and strong. Plant a weeping willow on my grave. Thanks for all Linnea has done for me and all good comradeship, with high regards.
"MIKE JOHNSON."

(Also postscript:) "Let my brother, Gust, have my clothes and small articles if he wants them.
"MIKE JOHNSON."

Upon the re-probate of the will in solemn form Mr. Michael J. MacMahon, an attorney at law, testified to the effect that he had known Michael Johnson, deceased, some twenty-five years; that he drew the will at the request of decedent; that Johnson told him of the property he possessed, and told him how he wanted it disposed of; that he wrote the will as Johnson directed; that he and the other witness, Mr. F. H. Patten, were present when Michael Johnson signed the instrument and both witnessed it at his request. On cross-examination Mr. MacMahon stated

that the writing with pen and ink, above quoted, was not contained in the document when it was signed; that there was no "scratching out"; that he was not a witness to the changes; that Johnson was going to leave the will with him, but changed his mind and took it away; that he could not tell what was stricken out; that there were two changes made, one stricken out with heavy ink and one in writing.    Mr. MacMahon further stated: (We quote from proponent's brief.)

"When he came to my office that morning to have the will drawn, he said, 'MacMahon, you are going to lose one of the best friends you ever had now.'    I said, 'What Swede is drafted now?'    He said, 'No joking about it; I am going to get out of here, and I came up to have my will drawn.'    And I said, 'All right, you sit down by the desk and take a piece of paper and fill out what you want in the will and I will draw the will for you.'    He sat down and wrote it out in long hand, and what he wrote out on paper I threw in the waste-basket.    I have not the paper now.    He wrote out all except the last two bequests; he just stated those two.    He dictated some things he forgot, the last two.    Yes, I understood he was going to commit suicide; at first I thought it was a joke, but before he left the office I knew he was not joking.    I think he was under some excitement.    Yes, he was suffering intense pain, he was in intense pain for years.    He was morose, had been that way for years. He was always serious; I never saw him laugh in my life.    He was a railroad contractor for years; then a saloon-keeper for years, and then sold soft drinks, and then went into the book-store on Third Street for years.

"He never disclosed to me at any time he had a mother.    I never knew he had a mother until after his death.    But did know he had some brothers and sisters.    Yes, he had physical pain all the time; had two tubes always drawing matter from his body; continually suffering, had been so suffering for ten or twelve years.    He never mentioned to me that he

had had a dependent sister living with his mother.
I don't know of him sending money to his mother."

Over the objection of contestant's counsel the testimony of F. H. Patten, who died before the hearing of the contest, taken in the probate of the will in common form was admitted in evidence.

Mrs. Wm. Lovegren testified in part thus:

"I was acquainted with Mike Johnson all his life. I am his aunt. His mother is my sister. She is older by 12 years than I. Yes; I know all the family. I knew the relatives in Sweden. He came over the same year I came. He had an uncle and a cousin who were insane. I think the first part of July, 1918, was the last time he was at our house. I was in the store ten days before he died. I spoke to him. He came and grabbed my hand, but he was awfully changed. Yes, he was friendly with me, but he had changed an awful lot. Well, he was acting funny. He did act very funny."

Johnson wrote her a letter which we quote:

"Portland, Oregon, 8–31–18.
"Dear Aunt Maria:

"When you receive this letter I will not be in this world, but I have always been crazy all through my life and now when I take my own life perhaps I will be doing the best thing I ever done. But, dear Aunt, write my little mother and tell her about this. Now I have not a friend or person in this city that I can trust myself in. If you ever think of me, sympathize with me, that has been doomed to be alone all my life. My brothers and sisters do not bother themselves about me; it seems they hate me. I have wondered many times if a curse hangs over me. Good-bye, may God bless you all.

"Friendly,
"MIKE JOHNSON."

Tom Burnes, a watchmaker next door to decedent's store, after stating that he had been acquainted with Johnson for several years, testified in substance:

"During the last ten days of his life he used to come in often to my place to get my opinion on books and things he would buy, and also to value jewelry for him, and two days before he committed suicide he wanted to buy a gun of me. 'I talked him out of it.' Prior to that he had often been in there and talked despondent, and when I went in to buy smokes of him and no one was around he would state he suffered, and told me he felt that he thought suicide was about the only thing to do. I told him he was foolish and used to talk him out of it. Well, outside of his saying he was constantly suffering, which often most drove him crazy, and it made him that way at times, he seemed the old Mike Johnson. He often had spells of despondency. Well, as he had said to me the pain and his suffering almost put him out of his mind, and that he did commit suicide, made me think he was not in his right mind. His mind did not seem like it used to be. I had known him six or seven years. I could not say how long he suffered this intense physical pain, approximately from seven to eight months. About the last week he brought in the same watch four times for me to tell him the value of it. Yes, he wanted the address of a firm in New York and he came to my store five or six times to get the same address."

On cross-examination Burnes stated in effect:

"Johnson conducted his business and waited on customers. The fact that he committed suicide is only one of the reasons for my saying he was insane, not the chief reason. My opinion that Johnson was not mentally all right was based on several things, well, a changing mind. He was losing interest, changing his mind, he was a 'Yes' and 'No' man formerly. Before that you never had to tell him twice. He knew what he wanted and once was enough. Yes; he was quick acting before that."

Harry Lofgren, in his testimony, among other things stated:

"I knew Mike Johnson in his lifetime. He was my first cousin. I am the son of Mrs. Lofgren, who testified here. I was present sometimes when Johnson came to their home for dinner and meals. He came twice a month sometimes; at times once a week, and then maybe it would be two months. He would sometimes come in and eat as any other person and act nice. Other times, he would grab his hat and get out, then come back and sit down, and at other times he would go out after he got up and not say a word."

Peter Lubich testified that Johnson said, "I have got a wheel in the head." Other witnesses testified to about the same effect.

Mr. Eric Helmer, who is nominated as executor of the will, testified on behalf of proponents, in effect, that he received from the deputy coroner an envelope containing the will of Mike Johnson and the package of articles left in his safe, and instructions as to the disposition of the articles, also the letter to the Swedish Society Linnea written in the Swedish language. He stated that the papers left at the coroner's office were turned over to him some weeks afterwards. Upon cross-examination he stated that he also received from the coroner's office a package with a handkerchief, some Liberty Bonds, building bonds, and his personal "affairs" and his pocket-knife. They were marked on the wrapping-paper to "Gust Johnson," who is shown to be the brother of the deceased. Mr. Helmer stated that there was also in the parcel $120 in gold; that the parcels are now in the safe with the rest of the belongings of the estate; and that the letters were mailed to the persons to whom they were addressed.

Michael wrote the following letter:

"Portland, Oregon, 8–31–18.
"Edward Johnson: The best friend I have and perhaps the only one who understands me.

"As you know brother Ed, I and Clara have now gone together for two years, not once, but a hundred times, have we talked about we would get married. I have often said to her that I was a little too old for her, but she assured me that such was not the case; consequently I have loved her as earnestly as I believe it possible for anyone to love. She has time after time assured me that she would have no one else but me. Now I have discovered that lately she has become enamored of a soldier, 'Soldiers murderers, and the whole world's curse.' Sufficient, I cannot live and lose her. (If you should lose your girl you will know what it means.) I will take my own life. In the testament I have given you my auto. * *

"May God help and bless you.

"From your unfortunate friend,

"M. Johnson."

It is admitted that petitioner, Elin Johnson, is the sole heir at law of her son, Michael Johnson, deceased.        Reversed.

For appellant there was a brief over the names of *Mr. F. H. Whitfield* and *Mr. Isham N. Smith,* with an oral argument by *Mr. Whitfield.*

For respondents there was a brief and an oral argument by *Mr. Waldemar Seton.*

BEAN, J.—It is contended on behalf of contestant that the entire evidence shows that the will is invalid because:

"(a) It was executed under and because of melancholia and insane delusions influencing the testator at the time.

"(b) Without containing words of disinheritance, it seeks to deprive the sole heir at law to whom testator owed the obligation of support, and who was dependent upon testator for support, of all property.

"(c) The trust attempted to be created is void for uncertainty in terms, beneficiaries and purposes.

"(d) The surrounding circumstances conclusively show that the will as probated is not the will of the testator, and that it attempts to dispose of his property in a way other than his expressed desires."

1, 2. Whatever conclusion we arrive at as to the mental capacity of Michael Johnson, deceased, on August 31, 1918, to dispose of his property by will, it appears to us from the record that as a matter of law and as a matter of fact the instrument probated as a will does not express the will of the decedent as to the disposition he desired to be made of his property. It is clear from the second clause of the will that he bequeathed the most of his estate to the Swedish Society Linnea in trust. It is stated that it is for the "Pearsons Fund," and that the property is to be "delivered" under the care of the society. The document does not direct for what purpose the proceeds of the property should be disbursed, whether for charitable, benevolent, social, religious, or educational purposes. It is evident that he used the word "delivered" in the sense of disburse. The testimony does not in any way explain or describe the "Pearsons Fund." In his letter to the Swedish Society Linnea, he expressed his wish more fully and more clearly than he did in the testamentary instrument. In the letter he states that he has left what he had to Linnea "to be used for benevolent purposes," and after expressing his wish as to his funeral and giving advice or proposing as to how the store should be disposed of, he remembers his mother, whom he did not mention to the scrivener who drew the will, and states, "I also wish you would take two hundred and fifty dollars from my savings bank book and send to my mother in Sweden," giving her address. He also requests, as we understand the record, which is not

plain as to this point, that a package containing
Liberty Bonds, building bonds and $120 in gold be
delivered to his brother, "Gust Johnson." The letter
appears to be a real expression of Mr. Johnson's
desire, but it was not witnessed or executed in ac-
cordance with the statutory requirements as to a
will.

Section 10095, Or. L., provides thus:

"Every will shall be in writing, signed by the tes-
tator, or by some other person under his direction,
in his presence, and shall be attested by two or more
competent witnesses, subscribing their names to the
will, in the presence of the testator."

The instrument in question was executed in accord-
ance with this section. Section 803, Or. L., declares
that a written will cannot be revoked or altered other-
wise than by another written will, or another writing
of the testator declaring such revocation or alteration,
and executed with the same formality required by law
for the will itself. There are exceptions which are
not applicable to this case. Therefore we cannot con-
sider the letter to the Swedish Society left by decedent
as a part of his last will and testament. To do so
would be to violate the statutory law and public policy
of this state. The letter, however, does furnish
practically conclusive evidence of the decedent's wish
which was not embodied or carried out in the execu-
tion of the instrument purporting to be his last will
and testament. By the erasure made by drawing a
heavy line through a portion of the typewritten second
clause of the instrument, we discover by the use of
a magnifying-glass, the words "and my Furniture and
my clothing and personal effects" were stricken out.
The writing with pen and ink which appears to be in
the handwriting of the decedent, requesting the send-

ing of packages, directs the disposition of valuable property, the amount of which is not shown by the record. The change made by striking out a portion and the insertion of the written clause, neither of which were witnessed, are additional circumstances indicating that the purported will as executed did not express the desire of the testator. It appears that on Friday, Michael Johnson went to Vancouver, Washington, and purchased the revolver after he had failed to obtain one in Portland. On Saturday, August 31, 1918, he executed the instrument in question. The letters referred to were mostly dated on that day. On September 5th, of that year, he committed suicide. For about a week prior to his death he appears to have been determined to take his own life. The execution of the purported will and the writing of the letters referred to above were all a part of the preparations to commit suicide. These letters, coupled with the circumstances of the execution of the will and the mental condition of the testator, show that this document is not the will of the testator. Its provisions are the result of his obsessions and delusions, which overcame his free will, and prevented him from stating in the document what he wanted done with his property.

In *Pettitt's Exrs.* v. *Pettitt,* 23 Tenn. (4 Humph.) 191, 194, the facts are quite similar, but not as strong, as those assailing the will at bar. The court said:

"A will prepared in view of suicide, and, of course, under the influence of the morbid and unhappy feelings leading to that catastrophe, must, where its validity is in question, be largely affected by that circumstance."

3, 4. In order for trusts to exist there must be an estate to vest in the trustee, and the property must

be clearly and definitely pointed out. The disposition to be made of the property must also be definitely stated. No trust that is uncertain is enforced by law, because the law would have to define it or create it before enforcing it. Accordingly in every instrument creating trusts there should be such certainty as will enable the court to carry them out. Where uncertainty exists, to such an extent that the court cannot see what object the creator had in view, or for what he intended to provide, the trust must fail: 26 R. C. L., p. 1183, § 20; Gardner on Wills, p. 533, § 140.

5, 6. The line of decisions is unbroken establishing the rule that there must be found within the terms of a declaration of trust a *cestui que trust,* and if there are no certain and competent beneficiaries named who may come into a court of equity and claim and establish their right to the fund, and to the execution of the trust, it will be void for uncertainty. It is not necessary to name the beneficiary, but he must be so designated or described that he can be identified: 26 R. C. L., p. 1189, § 25; *Pennoyer* v. *Wadhams,* 20 Or. 274 (20 Pac. 720, 11 L. R. A. 210); *Bryan* v. *Bigelow,* 77 Conn. 604 (60 Atl. 266, 107 Am. St. Rep. 64); *Doan* v. *Ascension Parish,* 103 Md. 662 (64 Atl. 314, 115 Am. St. Rep. 379, and note, 7 L. R. A. (N. S.) 1119); *Lane* v. *Eaton,* 69 Minn. 141 (71 N. W. 1031, 65 Am. St. Rep. 559, 38 L. R. A. 669); *People* v. *Powers,* 147 N. Y. 104 (41 N. E. 432, 35 L. R. A. 502); *Brown* v. *Caldwell,* 23 W. Va. 187 (48 Am. Rep. 376); *Festorazzi* v. *St. Joseph's Catholic Church,* 104 Ala. 327 (18 South. 394, 53 Am. St. Rep. 48, 25 L. R. A. 360); *Dashiell* v. *Attorney General,* 5 Har. & J. (Md.) 392 (9 Am. Dec. 572); *Maught* v. *Getzendanner,* 65 Md. 527 (5 Atl. 471, 57 Am. Rep. 352); *Sheedy* v. *Roach,* 124 Mass. 472 (26 Am. Rep. 680); *Holland* v. *Alcock,*

108 N. Y. 312 (16 N. E. 305, 2 Am. St. Rep. 420);
*Tilden* v. *Green,* 130 N. Y. 29 (28 N. E. 880, 27 Am.
St. Rep. 487, 14 L. R. A. 33); *St. James Parish* v.
*Bagley,* 138 N. C. 384 (50 S. E. 841, 70 L. R. A. 160);
*McHugh* v. *McCole,* 97 Wis. 166 (72 N. W. 631, 65
Am. St. Rep. 106, 40 L. R. A. 724); notes, 31 Am. St.
Rep. 38, 34 Am. St. Rep. 195, 61 Am. St. Rep. 725.

It is stated in 40 Cyc. 1727, thus:

"In order that a trust may be created by will the
testator must adequately indicate his intention to
create a trust by using language sufficient to sever the
legal from the equitable estate, and must, with suffi-
cient certainty, identify the beneficiaries, and the
property out of which the trust is to take effect.  This
proposition is steadily reiterated in the form that
'three circumstances must concur; and a certain or
ascertained object.' "

In order for a beneficiary to take under a will, he
must be designated therein, either by name or by
description, with such certainty that he can be readily
identified or distinguished from any other person.
Otherwise the devise or bequest is void for uncer-
tainty.

7, 8. Such designation, however, may be ascertained,
if possible, by inference from the whole will and ex-
trinsic circumstances.  The intention which controls
in the construction of a will is that which is man-
ifested either expressly or by necessary implication
from the language of the will, as viewed, in case of
ambiguity, in the light of the situation of the testator
and the circumstances surrounding him at the time it
was executed, although technical words are not used;
or, as it is sometimes stated, the testator's intention
must be ascertained from the four corners of the will.
A will cannot be construed by a mere conjecture as
to the intention of the testator; but it is the intention

which the testator expresses in his will that controls, and not that which he may have had in mind or which is manifested by some other paper not a part of the will: 40 Cyc. 1388b; *Yates* v. *Shern,* 85 Minn. 161 (86 N. W. 1004); *Stewart* v. *Jones,* 219 Mo. 614 (118 S. W. 1, 131 Am. St. Rep. 595); *Turney* v. *Sparks,* 88 Mo. App. 363; *Provenchere's Appeal,* 67 Pa. 463.

9. It is true that a purely charitable trust will be sustained where no beneficiaries are named, and that it derives its strength from the fact that its benefits are to be distributed among unknown persons, yet every other trust is void unless the beneficiary is certain and can be ascertained from the instrument: 2 Underhill on Wills, p. 1217, § 821.

10. As heretofore noted the will does not contain the word "benevolent" nor the word "charity." If we refer to the letter of Johnson it indicates that the fund is to be used for benevolent purposes. The purported trust is not defined, by the instrument probated, to be a charitable one. Benevolency is a much broader term than charity and embraces objects and purposes which are not charitable. The will cannot be sustained as creating a public charity: *Pennoyer* v. *Wadhams,* 20 Or. 274 (25 Pac. 720, 11 L. R. A. 210); *Van Syckel* v. *Johnson,* 80 N. J. Eq. 117 (70 Atl. 657); *Chamberlain* v. *Stearns,* 111 Mass. 267, 268; *Adye* v. *Smith,* 44 Conn. 60, 71 (26 Am. Rep. 424); *Norris* v. *Thomson's Exrs.,* 19 N. J. Eq. 307, 313.

The most that could be said of the record in this proceeding is that, taking the instrument executed and probated and the letters and directions of Michael Johnson, there would probably be sufficient data from which to construct a will; but the instrument executed for a will, when taken in connection with all the facts

and circumstances, does not appear to express the will of the decedent.

11. The burden of proof was upon the proponent to establish the testamentary capacity of the decedent by the preponderance of the testimony. Since the early case of *Hubbard* v. *Hubbard,* 7 Or. 42, it has been the rule that where a will has been probated in common form, and its validity has been attacked by direct proceedings, it is incumbent upon the person propounding the will to re-probate the same by original proof in the same manner as if no probate thereof had been had. In such a proceeding the burden of proof to show testamentary capacity of the decedent and the formal execution of a valid instrument is upon the party propounding the will: *In re Sturtevant's Estate,* 92 Or. 269, 276 (178 Pac. 192, 180 Pac. 595); *Holman's Will,* 42 Or. 345, 357 (70 Pac. 908); *King* v. *Tonsing,* 87 Or. 236 (170 Pac. 319). In *Ames' Will,* 40 Or. 495 (67 Pac. 737), it is stated:

"The rule is settled in this state that if a testator at the time he executes his will understands the business in which he is engaged, and has a knowledge of his property, and how he wishes to dispose of it among those entitled to his bounty, he possesses sufficient testamentary capacity, notwithstanding his old age, sickness, debility of body, or extreme distress." (Citing authorities.)

The rule thus enunciated presupposes that a valid instrument has been executed by the testator expressing his will as to the disposition of his worldly goods, in order for it to be upheld.

12, 13. The respondents, replying to appellant, suggest that the appellant "raises the question of the competency of the legatee, Swedish Society Linnea, to take bequests under said will." As we have noted the Swedish Society Linnea is named as trustee.

There is not so much importance attached to the naming of a trustee as to the naming of a beneficiary, as ordinarily the courts will not permit a trust to fail for want of a trustee but will appoint one. Evidently the proponents consider that, no beneficiary being named, the Swedish Society Linnea, the trustee, would take the property as a bequest to it. The rule is that if a trust fails by lapse, or be condemned as illegal, a devise or bequest to a person merely by way of trust is not to be construed into an absolute gift: Schouler on Wills, § 597.

14, 15. It is urged by the respondents that the petition for the contest does not raise the question as to the want of a beneficiary. The petitioner "denies that said pretended will is or was the will of said Michael Johnson, deceased," and in paragraph 7, above quoted, avers "that it is ambiguous and not the will of said deceased." In their answer the respondents deny these allegations, which leads us to believe that, while the petition is couched in general terms, it was understood by the proponents of the will as challenging the validity thereof. Had it been desired that the petition should be more definite and certain, a motion to make the same so would have been the proper procedure. The language of the pleading in a proceeding attacking the validity of a will should be sufficiently broad and specific to call in question the legality of the instrument and the competency and sufficiency of the proof as to its execution. The petition may waive or admit necessary facts and formalities attending the probate (*Mendenhall's Will*, 43 Or. 542, 548, 72 Pac. 318, 73 Pac. 1033); but it is doubtful if a petitioner could waive a patent defect inherent in the instrument itself. We conclude that the issue as to the beneficiaries was sufficiently presented by the

petition, especially in view of the answer of the proponents: *Mendenhall's Will*, 43 Or. 542, 548 (73 Pac. 1033), at page 549.

16. The testimony of Mr. MacMahon, who drew the will, indicated that Michael Johnson was, at the time of the execution of the instrument, under considerable excitement; that he did not mention his mother, whom the statute enjoined him to support if she were indigent, nor his brother, whom he desired to have some of his property. No doubt the $250 mentioned in his letter, if the direction had been properly contained in an executed will, would have been of great benefit to his mother and perhaps would have served her needs in her old age. The proponents have not shown by the testimony in this proceeding that Michael Johnson on August 31, 1918, had sufficient mental capacity to execute a will, nor that he did execute a will expressing his wish as to whom he desired to give his property. It appears that at the time of the attempted execution of the will his mind was more intent upon committing suicide than upon the details of the disposition of his property.

The decree of the probate court is therefore reversed; and the probated will of Michael Johnson, deceased, declared invalid and held for naught. The executor and legatees therein named will be required to account for all of the property that has come into their hands under said will. The petitioner, Elin Johnson, is declared to be the sole heir at law of Michael Johnson, deceased. After his debts and the costs and disbursements of this proceeding, and the expenses of administration of the estate, have been paid, the whole of said estate will be awarded to petitioner.                                    REVERSED.

BURNETT, C. J., and JOHNS and BROWN, JJ., concur.

100 Or.—11

Denied April 12, 1921.

ON PETITION TO TAX COSTS TO RESPONDENT.

(196 Pac. 1115.)

On petition to tax costs to respondent.

PETITION DENIED.

*Mr. F. H. Whitfield* and *Mr. Isham N. Smith,* for the petition.

*Mr. Waldemar Seton, contra.*

Department 2.

BEAN, J.—As will be seen by the former opinion, this is a proceeding to contest the will of Michael Johnson, deceased, in which the contestant, Elin Johnson, prevailed. The court adjudged that the costs of administration, and of this proceeding, be paid by the estate of Michael Johnson, deceased. By a petition disclosing considerable care and labor, counsel for appellant ask that the costs of this case be taxed against the respondents. They suggest that the taxing of the costs of this case would be the same as in a court of equity, and that the same rules should govern.

17, 18. It is very common, in the proceedings for the contest of a will, especially where doubtful questions are settled, to provide for the costs to be paid from the proceeds of the estate: See *In re Sturtevant's Estate,* 92 Or. 269 (178 Pac. 192, 180 Pac. 595). In writing our former opinion we gave the matter careful consideration. It appears that at the time of the death of Michael Johnson he left a book, notions, and cigar-store, of the value of about $6,000,

and other property.   Proceeding under what was in good faith presumed to be his will, the executor, to whom letters testamentary were regularly issued by the probate court, husbanded the property.   In so far as it appears to the court, all of the property is now intact and in good condition.   Elin Johnson has never been in this country.   She paid no attention to the property, as far as shown, and was not in a position to care for the same.   It was to her interest that the estate be cared for as it was.   The usual objection to paying costs from an estate in a proceeding to contest a will is where the contestant is unsuccessful, and such a provision might tend to promote litigation. Here the situation is different.   The will was probated in common form, and it was to the interest of all concerned that the question be finally settled and adjudicated.   Under all the circumstances, we think equity demands that the proceeds of the estate, which have been marshaled by the executor, should bear the expenses enumerated.

The petition is denied.        PETITION DENIED.

BURNETT, C. J., and JOHNS and BROWN, JJ., concur.