## NATHAN A. BROWN, RESPONDENT, v. MARY LORD ET AL., APPELLANTS.

SPECIFIC PERFORMANCE—BOUNDARIES OF LAND.—A court of equity will not decree the specific performance of a parol contract for the sale of land, unless such contract is explicit in its terms; nor unless the boundaries of the land are clearly defined.

PART PERFORMANCE—POSSESSION.—Where possession is relied on as an act of part performance of a parol contract, in order to take the case out of the operation of the statute requiring contracts in relation to the sale of lands to be in writing, such possession must be visible, notorious and exclusive on the part of the vendee, and must have been taken under and in pursuance of the parol agreement.

APPEAL from Yamhill County. The facts are stated in the opinion.

*E. C. Bradshaw and J. C. Moreland,* for appellants:

To entitle a party to a decree of specific performance upon a parol contract, the proof must be clear and satisfactory, so as to establish the contract to the entire satisfaction of the court, leaving no room for reasonable doubt, a mere preponderance of the proof will not suffice. (*Newson* v. *Greenwood,* 4 Or. 119; *Odell* v. *Morin,* 5 Id. 96; *Proudfoot* v. *Wightman,* 78 Ill. 553; *Williamson* v. *Williamson,* 4 Iowa, 279; *Wright* v. *Wright,* 31 Mich. 380; *Woods* v. *Farman,* 10 Watts (Pa.) 195; *Minturn* v. *Baylis,* 33 Cal. 129.)

When a contract for sale of lands is only supported by the testimony of the plaintiff, corroborated by admissions of the owner of the land, and is positively denied by the answer, specific performance will not be decreed. (*Wilmer* v. *Farris,* 40 Iowa, 309.) The plaintiff, who seeks to enforce a specific performance, must make out a stronger case than he who resists the decree; and greater latitude will be allowed in resisting than in making out a case. (Willard's Eq. Jur. 267; Story's Eq. Jur., sec. 769; *Casey* v. *Holmes,* 10 Ala. 776.)

The evidence of a parol sale of lands between parents and children must be very clear to avoid the statute; and all the acts necessary to perfect a right under such contract must have especial reference to it, and to nothing else. (*Cox* v.

*Cox,* 26 Pa. St. 375; 1 John's Ch. 131, 149; 1 Leading Cases, Eq. 732 *et. seq.; Phillips* v. *Thompson,* 1 Johns. Ch. 131; *Beard* v. *Linthicum,* 1 Md. Ch. Dec. 345; *Mundorf* v. *Kilbourn,* 4 Md. 459; *Mahana* v. *Blunt,* 20 Iowa, 142; *Moore* v. *Small,* 19 Pa. St. 461; *Johnston* v. *Clancy,* Blackf. 99.) It is not enough that the act of part performance relied on be evidence of some agreement, but it must be unequivocal and satisfactory evidence of the particular agreement set out in the complaint.

*McCain & Fenton and H. Hurley,* for respondent:

If a contract could have been enforced between the original parties, it will be decreed, to be enforced between their personal representatives, and all claiming under them. (Willard's Equity, 269; 5 Johns Ch. 261.)    Part performance of a parol contract takes it out of the statute of frauds, and entitles the party to its specific performance. (Willard's Equity, 283-5; Civ Code 264, sec. 772; 5 Kansas, 402; 45 N. Y. 416; 4 Com. (N. Y.) 403; 2 American Leading Cases, 755-60; 6 Paige, 288; 1 Story's Equity, sec. 761; 4 Sand. Ch. 72.)

A party is entitled to specific performance when his legal remedy is inadequate; when without it, great injury will be done, and when the contract is just, founded on an adequate consideration, and is executed on his part.    (1 Story's Equity, Tit. Spec. Per.; 6 Johns. Ch. 222; 3 Cowen, 456.) The authorities even go further than we claim in the case at bar, and hold that a parol gift of land, partly executed, will be enforced.    (8 Paige, 600; 2 Sand Ch. 17; 2 Story's Eq., sec. 761.)

A parol agreement between father and son, that if the son will enter upon a certain tract of land and improve it, the father will make the son a deed to the same, and in pursuance of said agreement, the son enters upon the land, occupies and improves it, is sustained by a sufficient consideration, and is not within the statute of frauds. (5 Kansas, 402; 43 N. Y., 35; 4 Paige, 305; Willard's Eq. 263; 4 Johns. Ch. 497.)    Where a donee has made improvements, a consideration always arises.    (1 Story's Eq.

sec. 753, n. 1.) The acts which constitute part performance, are possession under the contract, reliance upon the faith of the agreement, payment of the consideration, or its tender. Complete execution of the contract by the vendee is all that he can do, and even possession alone, without payment, has been held sufficient to take the contract out of the statute of frauds. (1 Story's Eq., sec. 759-60-61.) The testimony of one competent witness, not contradicted, proving the facts alleged, will sustain the decree, and the court will not reverse if, upon an inspection of the whole record, the judgment was right, even though the court below may have erred in its rulings upon the admission of testimony. The error then becomes immaterial. (Civ. Code, 246; sec. 671.)

By the Court, KELLY, C. J.:

This is a suit in equity to enforce the specific performance of a parol contract for the sale of lands, alleged to have been made by James H. Brown, senior, the father of respondent, who died intestate May 30, 1875. The appellants are daughters and heirs in law of the said James H. Brown, and their husbands, who were joined with them as defendants in the suit. The material portions of the complaint are substantially as follows: That at the death of James H. Brown, senior, he was the owner of the lands described in the complaint known as the west one half of his donation land claim, in Yamhill County, Oregon, and containing three hundred and twenty-one and one half acres. That he also owned at his death another large and valuable tract of land in said county. That his estate has been administered, and finally settled, and his administrators discharged. That on or about January 20, 1872, at Yamhill County, Oregon, the decedent, in consideration of the natural love and affection he bore the respondent as his son, and in consideration of the agreement of respondent then and there made, that he would remain with said James H. Brown and care for him and the said S. W. Brown, respondent's mother, during the natural life of said James H. Brown, senior, the said James H. Brown,

senior, gave the respondent this tract of land, and placed him in possession thereof, and then and there agreed to convey the same to him by a good and sufficient deed, whenever he desired him to so do. That the respondent, in pursuance of his said agreement, did remain with his father from that date until his death, and cared for and supported him and respondent's mother during the natural life of James H. Brown, senior, and has ever since cared for and supported and does now care for and support her.

That at said date, in pursuance of said agreement, he entered into possession of said tract of land, and did thereafter, during the whole of the life-time of his father, occupy and hold possession of the same, with the knowledge and assent of his father, under said agreement, and made extensive and valuable improvements thereon. That he has ever since the date of said agreement been and now is in possession of said lands. That on May 30, 1875, James H. Brown, senior, was taken violently ill, and died suddenly on that day, without having made a deed to respondent for these lands, though always intending and desiring to do so.

The material portions of the complaint are denied.

The court below rendered a decree for a specific performance of the contract, from which an appeal is taken. The following is the substance of the testimony which we consider material to the issue between the parties:

Nathan A. Brown, the respondent, testified substantially as follows: That the land in controversy is the west half of the donation land claim of James H. Brown, his father, who had resided on it for many years prior to the twentieth day of January, 1872; that all his children except the respondent, who was the youngest of seven, had married and gone from their father's home; that on the twentieth day of January, 1872, when he was twenty-four years of age, he spoke to his father about going away from home and renting a piece of land, when his father replied that he was getting old, and if respondent would stay with him during his lifetime, take care of him and his mother while they lived, and look after and take care of his stock on the place, he would give him the land—the west half of the donation claim on

which he lived; that he could go on and break up what land he wanted to from that time on; that respondent then accepted his father's proposition, went on and broke up ground, hauled rails and fenced it, built a large cattle-shed, looked after and fed his father's stock on the place when it was necessary, and stayed with and took care of his father and mother during his life, and has supported his mother at the old homestead since his father's death; that he has had the possession and control of the land in controversy since January 20, 1872, and made improvements on it worth between eight hundred and nine hundred dollars; that his father promised to give him a deed of the land at any time he would request it, but that he did not get the deed because he was too careless and negligent to ask for it, and did not expect his father to die so suddenly.

On cross-examination he testified that his father resided on the land after the contract, the same as before, but he (respondent) had control of it; that his father's horses, cattle and hogs were still kept on the place the same as before; that his father gave in the land to the assessor for taxation, although respondent paid the taxes; that when the agreement was made with his father in January, 1872, no one was present except his father and himself.

The testimony of Mrs. S. A. Brown, the mother of respondent, so far as material, is substantially as follows: That in 1872 her husband told Nathan that he had stayed with and worked for his father and mother and he should have the land for taking care of them; that he was to live with and take care of them during life; that Nathan had possession and control of the premises after 1872; that her husband had often told Nathan that he would give him a deed, and said so a few days before his death; that the reason why the deed for the land was not made was that it was not surveyed to suit them.

Joseph E. Brown, a brother of respondent, testified in his behalf, that on the twenty-eighth day of November, 1873, he had a conversation with his father, when in speaking of the land in controversy, he said that he intended that land for Nathan, but said he wanted to reserve forty acres where the

house stands. When he asked his father why he reserved the forty acres, he replied that possibly Nathan might marry an unruly woman, and they could not live together. That he intended to reserve the house and barn and forty acres of land as long as he lived. That witness could not say who had possession and control of the premises, but that Nathan worked the land since the spring of 1873. That he built a granary and straw shed on the same, but knew of no other improvements made by him except that he broke up about six acres of sod land; that since he came back from California in the spring of 1873, he has lived within less than one half a mile from his father's place and that his father continued in possession and control of the premises in controversy until his death. The granary spoken of was put up since his father's death, and the shed before, but could not say whether they were on the forty acres or not, as the forty acres were never run off.

Charles Stewart and William D. Parker testified that in July, 1871, they were working together for James H. Brown, when he said in their presence that he calculated to give Nathan the home place.

W. Millsup testified that in the fall before he died, James H. Brown said to Henry Lamson and himself, when they got to the line of his donation claim, that he intended to give that to Nathan, pointing to the lines.

H. W. Lamson testified that in riding in company with Mr. Millsup and James H. Brown, when they got to the west line of Joseph's land, Mr. Brown said he intended to give the balance of the home place to Nathan. This was the fall before he died.

Nathan Hussey testified that James H. Brown told him he intended the home place for Nathan. (No time is given when this statement was made.)

Luke Booth testified that in 1874, James H. Brown, senior, remarked in his shop that he intended the home place for Nathan, and in the spring of 1875, he told him to charge some work he was doing to Nathan, as he had the place.

The foregoing is the substance of the evidence on part of the respondent so far as it is material in this case.

William Savage, one of the appellants, testified in substance as follows: That in the fall of 1873, he had a conversation with James H. Brown, senior, in regard to a division of his real estate among his sons. That in this division, as it was detailed to him by his father-in-law, Mr. Brown, the respondent Nathan was to have the east half of the west half of the donation land claim of James H. Brown, and also a piece off the Faulconer and Ransdall places to make his equal with the other sons. That since 1869, when James H. Brown returned from Walla Walla, he resided on, and had possession of the land in controversy until his death. That Nathan A. Brown worked upon it the same as he did before 1872, that is, there was no change from 1872 until the death of his father, in his possession or control from what there had been prior to that time. That James H. Brown had an abundance of property of his own and supported the family himself, and that he and his wife took care of themselves. That he had cattle, horses, sheep and hogs on the place, and frequently sold some stock for money with which the family groceries and other provisions were purchased. That Mr. Brown often told him that he thought his daughters were entitled to as much property as his sons, and that he aimed to give them an equal share.

T. P. Stephens, being recalled, said that he supposed James H. Brown, senior, had the possession of the premises described in the complaint since 1872; that he never knew anything to the contrary; that when he wanted anything off the place from October, 1874, till the time of his death he always went to him, for he supposed him to be the proprietor of the place.

H. W. Lamson, being recalled, testified that he knew the land in controversy before and since 1872, and that he knew of no change in the possession of the property since 1872 till the death of Mr. Brown.

Section 771 of the civil code of this state provides that: "No estate or interest in real property other than a lease for a term not exceeding one year, nor any trust or power concerning such property can be created, transferred or declared otherwise than by operation of law or by a convey-

ance or other instrument in writing subscribed by the party creating, transferring or declaring the same, or by his lawful agent, under written authority, and executed with such formalities as are required by law."

Section 722, following, declares that "the last section shall not be construed * * * to affect the power of a court to compel specific performance of an agreement in relation to such property."

The English statute of frauds and perjuries passed during the reign of Charles II has been generally re-enacted in the different states in the Union, and in their essential features they are similar to the statute of Oregon above quoted. There, as here, the object had in view was, as the very title of the English act of parliament indicates, to prevent the fraudulent setting up of pretended agreements, and then supporting them by perjury. But besides this direct object, there is a manifest policy in requiring all contracts touching lands to be reduced to writing, since otherwise from the imperfection of memory or from the honest mistakes of witnesses, after a great lapse of time, it must frequently happen either that the specific contract is incapable of exact proof, or that it is unintentionally varied from the precise original terms. The requirements of the statute are so reasonable and so easily complied with, and the security of land titles against the testimony of false or forgetful witnesses so important that it would seem there ought to have been no exception to the rule of declaring absolutely void every agreement not made in accordance with its provisions.

Mr. Justice Story says: "It must be admitted that the exceptions thus allowed do greatly trench upon the policy and objects of the statute of frauds; and, perhaps, there might have been as much wisdom originally in leaving the statute to its full operation without any attempt to create exceptions, even in cases where the statute would enable the party to protect himself from a performance of his contract through a meditated fraud. For, even admitting that such cases might occur, they would become more and more rare as the statute became better understood; and

a partial evil ought not to be permitted to control a general convenience." (1 Story Eq. Jur., sec. 765.)

Many distinguished judges both in England and the United States have within the last fifty years expressed similar opinions, and placed on record their regrets that the statute of frauds had been departed from so widely, and their convictions that more evils have resulted from such departures than they have remedied. "And considerations of this sort have led eminent judges to declare that they would not carry the exceptions of cases from the statute of frauds farther then they were compelled to do by former decisions." (1 Story Eq. Jur., sec. 166.)

These expressions of opinion should be heeded and well considered by this court, and especially so, since by our laws a party to a suit can be a witness in his own behalf, and offer his own testimony, as was done in the case under consideration, to substantiate, not only the parol agreement itself, but also every material fact to prove a performance of all the conditions of the contract on his part.

This court held in the case of *Odell* v. *Morin*, 5 Or. 96, which was a suit for the specific performance of a parol contract for the sale of land, that "the contract which is sought to be specifically executed ought not only to be proved, but the terms of it should be so precise as that neither party could reasonably misunderstand them. If the contract be vague or uncertain, or the evidence to establish it be insufficient, a court of equity will not exercise its extraordinary jurisdiction to enforce it."

The contract in this case, as set forth in the complaint, is, that on or about the twentieth day of January, 1873, in consideration of the agreement that respondent would remain with James H. Brown, his father, and care for him and his mother during the life-time of said James H. Brown, he, the father, gave to respondent the west half of his donation claim, being the land in controversy, and placed him in possession of it, and agreed to convey the same to him by a deed, when respondent should desire him to do so. The respondent further alleges in the complaint that in pursuance of this agreement he did remain with his father from

the twentieth of January, 1873, until his death, and cared
for and supported him and respondent's mother during the
life of his father, and since then he has cared for and sup-
ported his mother.  He also alleges that ever since the date
of the agreement he has been in the possession of said lands.
The only evidence in the case to prove the making of the
agreement is that of the respondent himself, who says it was
made on the twentieth day of January, 1873, when he and
his father were alone.  He is, however, corroborated by his
mother in this, that she says her husband told Nathan, the
respondent, in 1872, that he should have the lands for taking
care of them; that he often told him that he would give him
a deed for it, but the deed was not made because it was not
surveyed to suit them.  The latter part of this testimony
is important in this respect, that it shows some survey was
necessary to designate the land which he intended for the
respondent.  And taken in connection with Joseph E.
Brown's evidence that his father stated to him on the twenty-
eighth of November, 1873, that he intended to reserve forty
acres where the house stands, it satisfies us that a survey
was intended to set off a portion of the west half of the
donation claim, which was not to be conveyed to respond-
ent.  The testimony of Joseph E. Brown is clear, explicit,
and pointed.  He was a disinterested witness called by the
respondent, and when he asked his father why he reserved
forty acres from the land which the respondent claims, the
old gentleman replied that Nathan might marry an unruly
woman and they could not live together.  This shows the
prudent foresight of James H. Brown, senior, and his de-
termination to retain his homestead while he lived.  William
Savage testifies that in the fall of 1873 Mr. Brown, senior,
told him that he only intended to give the eastern half of
the land in controversy to the respondent, clearly showing
that he intended to retain his dwelling-house for himself.
All this evidence is inconsistent with the theory that James
H. Brown, senior, had given the land to the respondent on
the twentieth of January, 1873, or at any time.

   Then we have the testimony of Millsup, Lamson, Hussey
and Booth, detailing conversations which they had with Mr.

Brown, senior, from the time of the alleged contract until near the time of his death; and all of them say that the father of respondent said he intended to give the home place to Nathan, not that he had given it as claimed by respondent. By what means he intended to give the land to the respondent, whether by deed or by a will, is not disclosed. It is sufficient to say that the weight of the testimony is against the contract as alleged in the complaint, although we are satisfied that it was the intention of James H. Brown to give the west half of his donation claim to the respondent, but not in pursuance of any alleged agreement with his son, by which he was to give up the possession and control of his homestead.

Even if we assume that the alleged parol agreement was sufficiently established, still we think the respondent has failed to show such acts of performance or part performance of his part of it as will take the case out of the operation of the statute. The respondent testifies that he took possession of the premises when he made the contract with his father in January, 1873. In this he is corroborated by his mother, but the preponderance of the testimony is decidedly the other way, and goes to show that James H. Brown was as much in the possession of the premises after as he was before the month of January, 1873. Owing to the infirmities of age, he no doubt entrusted the care of the property to the respondent more towards the close of his life than he did in former years. To entitle the respondent to a decree for the specific performance of the alleged contract he should establish by the weight of testimony that he took possession of the premises under the contract, and that such possession was distinct, visible and exclusive. The supreme court of Indiana, in a case brought to enforce the specific performance of a parol contract for the sale of land, say: "The great leading principle by which courts are governed is that there must be some act of performance done that is palpable and evident to the senses of all—an act that can be relied on as certain, about which there can be no misunderstanding, and which does not rest solely in the recollection, understanding or belief of witnesses; such

as absolute and visible possession of the premises, the actual building of houses or the making of other lasting improvements." But even these acts of part performance must be done with a direct view of the agreement being performed and be such acts as could be done in no other view, or the agreement will not be taken out of the statute. (*Johnston* v. *Gloncy*, 4 Blackford, 98 and 99.)

A specific performance of a parol contract for the sale of real estate by one partner to another will not be enforced where the only change of possession is the withdrawal of the vendor and the continuance of the vendee in possession, because the latter does not take possession under the contract. (*Wilmer* v. *Farris*, 40 Iowa, 309.) The continuance in possession by a tenant can not be deemed such a part performance or taking of possession under a contract of purchase as to take the case out of the statute of frauds. The possession must unequivocally refer to and result from the agreement. (*Mahana* v. *Blunt*, 20 Iowa, 142; 1 Story's Eq. Jur., sec. 763.) And where a son is in possession of land claiming it under a parol agreement with his father, the proof of such possession must be direct, positive, express and unambiguous.

In deciding a case of this kind the supreme court of Pennsylvania says: "We may notice still another principle of law that is applied very beneficially to restrain the exceptions to the statute of frauds, and which is of especial importance in this case, though its application is not peculiar to cases under this statute. We allude to the law of evidence that grows out of the family relation. It is so usual and natural for children to work for their parents, even after they arrive at age, that the law implies no contract in such cases; and it is so natural for parents to help their children by giving them the use of a farm or house, and then to call it theirs, that no gift or sale of the property can be inferred from such circumstances. The very nature of the relation, therefore, requires the contract to be proved by a kind of evidence that is very different from that which may be sufficient between strangers. It must be direct, positive, express and unambiguous. The terms must be clearly

defined, and all the acts necessary for its validity must have especial reference to it and nothing else. The importance of this rule is very apparent, for it requires but a glance over the cases of this class to discover how sad has been the experience of the courts in family disputes growing out of the exceptions which have been allowed to this statute; and how many and how distressing must have been the ruptures of the closest ties of kindred that have been produced and perpetuated by the encouragement thus given to try the experiment of extracting legal obligations out of acts of parental kindness." (*Poorman* v. *Kilgore,* 26 Pa. St. 372.)

As we have already said, the preponderance of testimony shows that there was no apparent visible change in the possession of the premises by James H. Brown after the twentieth day of January, 1872. He, to all appearances, exercised as much authority and control after as he did before the alleged contract. He maintained and supported himself and his wife out of his own means, and no one could detect any change in the condition of his affairs which would lead him to suppose that the old gentleman had ceased to be the owner of the house in which he had lived so long. We think the possession of the premises by the respondent under the alleged parol agreement is not sufficient to take this case out of the operation of the statute.

Concerning the permanent improvement which respondent says he put upon the premises we will quote a few sentences from another decision of the supreme court of Pennsylvania, in a case somewhat like the one under consideration. It expresses our own views. "In the very nature of these family transactions, such improvements are not evidence of a gift of the land ; and no matter how unjustly a father may seem afterwards to have acted to his son, or how unfortunate it may be for him that his father died without carrying out his intentions, we cannot correct the mischief by giving the son the land. Mischief though it be, it is slight and temporary compared with the evils which would be caused to families if the law should hold out inducements to litigation as a means of correcting such parental errors." (*Cox* v. *Cox,* 26 Pa. St. 384.)

And although in the division of his estate it was the intention of James H. Brown to give the land in controversy to the respondent either by a deed or by an intended will, yet having failed to carry his intentions into effect, this court can not do it for him.

The decree of the court below is reversed and the complaint dismissed.