Argued July 7, affirmed September 27, 1921.

# GOODIN ET AL. *v.* CORNELIUS ET AL.

### (200 Pac. 915.)

**Specific Performance—Contract to Devise Property Held Supported by Consideration.**

1. A contract to devise land, in consideration that plaintiffs remove from their residence to the property in question, make it their home, keep up all improvements, and pay promisor and wife a certain annuity, was supported by adequate consideration to warrant specific performance.

**Specific Performance—Oral Contract to Devise Land must be Clear, Just, Reasonable and Mutual.**

2. In order that an oral contract to devise land may be enforced by a court of equity, it must be clear, definite, certain, just, reasonable and mutual in all its parts.

**Specific Performance—Oral Contract to Devise Need not be Proved Beyond Reasonable Doubt.**

3. An oral contract to devise land need not be proved beyond reasonable doubt in a suit for specific performance.

**Specific Performance—Oral Contract to Devise Held Established by Evidence.**

4. In an action for specific performance of an oral contract to devise land, where plaintiffs relied upon possession, making of substantial improvements, and other valuable considerations, moving to the decedent, evidence *held* sufficient to satisfy the requirements of equity.

**Evidence—Declarations by Decedent as to Devise Under Agreement Admissible.**

5. In an action for specific performance of an oral contract to devise land, evidence of declarations against interest made by decedent during his lifetime was relevant and admissible, under Section 710, Or. L., and Section 727, subdivision 4, but they should be considered by the court with caution.

**Wills—Contracts in Family to Devise Property Legal.**

6. It is competent for a parent to contract with a child that, if the child will care for certain land and pay an annuity to the parent, the latter will devise such land to the child at his death, and the parent has no lawful right, after partial performance of the agreement on the part of the child, to alter his will so as to reduce the acreage of the place to be devised.

---

1. Agreements to make particular dispositions of property by will and the mode of their enforcement, see note in 66 Am. Dec. 784.

Specific performance of contract to make will, see notes in Ann. Cas. 1914A, 399; Ann. Cas. 1918A, 1191.

From Washington: GEORGE R. BAGLEY, Judge.

Department 2.

This is a lawsuit carried on by the heirs at law of Benjamin Scholfield, deceased. The plaintiffs instituted suit in the Circuit Court of the State of Oregon in and for Washington County, for the purpose of securing a decree for the specific performance of an alleged oral contract relating to the devise of real property by will. The complaint alleges, at paragraph XII:

"That Benjamin Scholfield died within Washington County, Oregon, on the 24th day of June, 1917, and at the time of his death was the owner, amongst other properties, of all the following bounded and described real property situate within Washington County, Oregon, and more particularly bounded and described as follows, to wit:

"Beginning at a point on the base line in Section 3, Township 1 South, Range 3 West of the Willamette Meridian, in Washington County, Oregon, where the West boundary of county road number 528 (prolonged) would intersect said base line; thence South 0 degrees 29 minutes West following West boundary of said road number 528, 2273.5 feet to the South line of the said McLinn D. L. C., thence following the South line of the said McLinn D. L. C. South 89 degrees 49 minutes West 970 feet, to a monument, thence North 0 degrees 2 minutes East 182 feet, thence North 89 degrees 48 minutes West 84 feet, thence North on the division line along the center of the road 2084.6 feet to the base line, thence East following along the base line road to the place of beginning, excepting therefrom the So. P. Ry. Co.'s right of way, and excepting a tract of land deeded to —— on the —— day of ——, 19—."

The complaint further alleges:

"That at the time of his death he left the following heirs at law:

"Ruth A. Cornelius, a daughter.

"William T. Scholfield, a son.

"Rebecca Ellen Goodin, a daughter.

"Mary Jane Ward, a daughter.

"Harriet Eva Yoder, a daughter.

"Claude Cook, a grandson.

"Earl Cook, a grandson.

"Iva Clark, a granddaughter."

Paragraph XV alleges a promise to devise:

"That on or about the 15th day of June, 1909, the above named plaintiffs were residents and inhabitants of Clatsop County, Oregon, and the plaintiff W. A. Goodin was at that time, and had been for a long period of time immediately preceding said date, engaged in the general contracting business, and was, and had been for many years immediately prior thereto, a successful contractor; and that upon said date a verbal and parol agreement was made and entered into by and between the plaintiffs upon the one side, and Benjamin Scholfield, deceased, upon the other side, and wherein and whereby it was stipulated, understood and agreed to that for and in consideration of the promises, covenants and agreements hereinafter contained and to be performed by the plaintiffs herein, the said Benjamin Scholfield undertook, promised, covenanted and agreed that he would make, execute, publish and declare a valid last will and testament wherein and whereby he would bequeath and devise all of the real property hereinabove described in paragraph XII to the above named plaintiff Rebecca Ellen Goodin, and that upon his death he would leave such valid last will and testament bequeathing and devising to the said plaintiff Rebecca Ellen Goodin said real property set forth in paragraph XII in fee simple and that she would, at his death and by the terms of said last will and testa-

ment, become the absolute owner in fee simple, free
and clear of all liens, claims and incumbrances, of all
of the real property described in said paragraph
XII."

Paragraph XVI avers the consideration:

"That said last will and testament was to be exe-
cuted aforesaid for and in consideration that the
plaintiffs, who were then residing at Astoria, Clatsop
County, Oregon, would remove from their said resi-
dence to and upon the real property hereinabove
described and make their home and remain thereon
until the said Benjamin Scholfield and Sarah V.
Scholfield, his wife, should both become deceased;
that the plaintiffs should make all necessary improve-
ments upon said real property at their own expense,
and maintain and keep up all improvements then be-
ing thereon, and that they would pay all taxes and
assessments, of every kind and nature, levied and to
be levied and collectible against said land, and to keep
all buildings and improvements thereon in good re-
pair and to pay to Benjamin Scholfield as long as he
should live an annuity of $100 per annum, and in the
event he should die before his wife, then in that event,
to pay to her, the said Sarah V. Scholfield, said an-
nuity of $100 per annum for and during the term of
her natural life."

Paragraph XVII is as follows:

"That said agreement and all the terms thereof
were fully agreed to and accepted by the said Benja-
min Scholfield upon the one side, and by the plaintiffs
upon the other."

Paragraph XVIII relates to the delivery of the
possession of the farm by Benjamin Scholfield to
plaintiffs, the paying of the alleged annuity, and the
construction of valuable improvements thereon, and
paragraph XX avers that in order to carry out said

oral agreement, plaintiff Goodin abandoned his said contracting business.

The complaint alleges that Benjamin Scholfield died June 24, 1917, but that he did not perform his part of said agreement, in that although he made his last will and testament, only a portion of such real estate set forth in paragraph XII was devised to plaintiff Rebecca Ellen Goodin, a tract containing about 17.70 acres thereof having been left to the heirs of said Benjamin Scholfield.

It is further alleged that the last will of Benjamin Scholfield was, on August 2, 1917, duly admitted to probate, and that one J. W. Shute was on that date appointed, and duly qualified, as executor thereof.

By the answer of the defendants, the sole issue presented is, whether or not the contract alleged was entered into between the plaintiffs, or either of them, and Benjamin Scholfield, and whether the same was performed by the plaintiffs.

The court found:

"That on the fifteenth day of June, 1919, plaintiffs were residents and inhabitants of Clatsop County, Oregon, and the plaintiff W. A. Goodin, was then, and had been for a long period of time * * engaged in the general contracting business * * ; that upon said date a parol agreement was made and entered into by and between the plaintiffs and Benjamin Scholfield, wherein it was * * agreed that for and in consideration of the promises and covenants * * to be performed by the plaintiffs as alleged in their complaint, the said Benjamin Scholfield undertook, promised, covenanted and agreed that he would make, execute, publish and declare a valid last will and testament, wherein and whereby he would bequeath and devise all of the real property hereinabove described to the plaintiff Rebecca Ellen Goodin, and

that upon his death he would leave such valid last will and testament, bequeathing and devising to the said plaintiff Rebecca Ellen Goodin said real property * * in fee simple.

"That said agreement and all the terms thereof were fully agreed to and accepted by the said Benjamin Scholfield upon one side and the plaintiffs upon the other.

"That on the tenth day of October, 1909, by virtue of and in pursuance to the terms of said parol agreement, and for and in consideration of the promise to devise and bequeath to said plaintiff Rebecca Ellen Goodin the said real property, the plaintiffs removed from their residence in Astoria, Oregon, to and upon the above described lands, and * * in pursuance of said parol agreement Benjamin Scholfield delivered over to such plaintiffs the absolute and exclusive possession of said real property, and that from said date and thereafter until the death of said Benjamin Scholfield, they continued to pay to him the said annuity of $100, and that thereafter and * * until the death of the said Sarah V. Scholfield these plaintiffs did pay to and continued to pay unto the said Sarah V. Scholfield said annuity of $100, and that these plaintiffs, after taking possession of said real property, and by virtue and pursuant to the terms of said parol agreement, made valuable improvements upon the same and expended money thereon in the following ways * * :

"(a) In the construction of new fences * *.....$500
"(b) In repairing dwelling-house * *.......... 500
"(c) In repairing barn * *.................... 200
"(d) In construction of a milk and separating house * *...... ............ .......... 125
"(e) In construction of a silo................... 250
"(f) In ditching and tiling said land * *....... 75
"(g) In constructing a hog-house * * ......... 35.
"(h) In constructing walks upon said premises * *.......... .......... .......... 25
"(i) In planting ½ acre of walnut trees * *.... 75

"(j) In planting an orchard of apples, cherries and prunes * * ..................... 75

"(k) In construction of a system of pipes and piping for inducting water * * ......... 110

"(l) For the installation of electric wires, * * lights and * * fixtures * * ........... 95

"(m) That the said land had become foul and the soil run down, and plaintiff redeemed said premises from all obnoxious weeds and built up and rejuvenated said soil at the expense of much labor and money.

"That * * plaintiffs have * * paid all the taxes and assessments levied against said lands, and have in each, every and all respects, carried out and fulfilled each and every covenant and obligation upon their part; and in order to carry out * * the terms of said verbal agreement * * plaintiff W. A. Goodin gave up, * * quit and abandoned his contracting business.

"That the said Benjamin Scholfield failed and neglected to make, execute, publish, declare and leave at his death a valid last will and testament bequeathing and devising a fee simple title to the land described in paragraph XXII, to the plaintiff Rebecca Ellen Goodin.

"That the estate of said Benjamin Scholfield, deceased, has not been distributed or closed of record."

Based upon its findings of fact and conclusions of law, a decree was entered by the court below, as prayed for in the complaint.

The answering defendants prosecute this appeal.

AFFIRMED.

For appellants there was a brief over the names of *Mr. G. C.* and *Mr. A. C. Fulton,* with an oral argument by *Mr. G. C. Fulton.*

For respondents there was a brief and an oral argument by *Mr. E. B. Tongue.*

BROWN, J.—1. The defendants assert that the complaint is insufficient in that it fails to aver an adequate consideration for the agreement alleged to have been made by plaintiffs with Benjamin Scholfield.

Paragraph XVI of the complaint avers the principal consideration for the contract involved in this suit. This averment has already been set out in full herein, and it is unnecessary to repeat it. The allegation speaks for itself. It is enough. The objection to the complaint is without merit. From the face of the complaint, there appears an adequate consideration moving from the promisees to the promisor.

The defendants also assert:

"(1) There is no evidence in support of the alleged contract pleaded.

"(2) There is no evidence in the record showing, or tending to establish, any contract capable of being specifically enforced."

The farm averred to have been the subject of the contract between the plaintiffs and Benjamin Scholfield is known as the Scholfield old home place. Previous to the making of the contract Scholfield had executed his will, wherein he had devised the old home place to a daughter, Rebecca Ellen Goodin, one of plaintiffs herein. After entering into the contract he executed a second will, again making the same devise to his daughter, Rebecca Ellen Goodin. About a year prior to his death, he executed a third will, and again devised the same tract of land to the daughter, less about eighteen acres cut from the east side thereof, which is the land involved in this controversy.

In addition to the old home farm, he owned other valuable lands, consisting of about 300 acres situate near Gaston. These lands he had made up his mind to devise to his daughters Ruth A. Cornelius, Harriet Eva Yoder and Mary Jane Ward, giving to each 100 acres thereof. He had already given to defendant William Scholfield, a son, 187 acres of the home place and had rendered him other assistance.

Plaintiffs state that their sole inducement to leave Astoria and move upon the old home place, take possession, construct valuable improvements thereon, and by years of industry restore the old farm to its former fertility, was the contract made between them and their father, Benjamin Scholfield. For the purpose of establishing that contract, and the performance thereof, the following constitutes a portion of the evidence received during the trial of the cause in the court below:

W. A. Goodin, one of the plaintiffs, testified:

"A. He [Mr. Scholfield] asked me if I didn't want to go on the place. He said he would will it to my wife; that the man that lived on it had given it up, that he had it rented and he asked to be released and he released him; and he said the place was badly run down and he wasn't making anything out of it and it wasn't hardly paying the taxes and he couldn't hardly afford to keep it and handle it himself; that he couldn't handle it himself, and he said he had an offer to buy it and he would sell it unless I would move on it. * * I said I would move on it if my wife would inherit it. I didn't care to move on the place and fix it up and then have it go back into the estate; that I was an old man myself. * * He said it was all fixed up; that that part of it was all fixed up and that he had it willed to my wife; and I asked him if he would be willing to will it to me if I outlived her, and he said he would, and I moved on.

"Q. Is that all the conditions? * *

"A. He told me that the place was run down and he didn't believe I could make a living on it and he would help me, and he expected me to pay the taxes and a hundred dollars a year. He said that Mr. Ward (another son-in-law) paid two hundred dollars a year for the place he had up there, and he wanted me to pay a hundred dollars a year. * * He said that he (Mr. Ward) had it under the same condition. * * The next day I went back to Astoria and we talked it over, my wife and I, and we concluded we would move on the place. * * We moved up the last of August or first of September and lived with the old folks (Benjamin and Sarah Scholfield) until Mann (the tenant) vacated the place. * * We talked about it a great many times and it was always the same proposition. * * I went on the place and took possession of it and always had full possession of it according to my agreement. I took full possession of it and always had full possession, management and control of it at all times * * continuously since the fall of 1909."

Witness testified that he had paid all the taxes and the annuity of $100 per year since he had been on the place; that when he moved on the land "the house and the roof was full of holes and leaking; paper was off the walls; the woodshed was about to fall down; the barn was off its foundation and the fences were gone." He stated:

"I built all the partition fences that are on the place now; there are two 80-rod fences running down through the center and there is a lane—a cross fence 112 rods long and one about half that length. * * And the fence around the barn lot and around the little lot in front of the house and around the orchard * * . And I constructed a fence on the west side. * * Some of the fences were woven wire with barbed wire on top, and some were barbed wire. * * And I have kept them in repair."

He then testified that he repaired the dwelling-house and made various improvements. He swore that he would not have removed from Astoria and gone on the farm but for the agreement; also, that he made the improvements on the farm only because of the existence of the contract; that his father-in-law had said, "Every time I drove a nail or put a bit of improvement on this place, you are doing it for yourself." Witness testified that about two years after they went on the place two brothers by the name of Buchanan wished to purchase a strip of land for a right of way; the father-in-law refused to sell, stating that "it was up to us, * * and he couldn't sell unless it was agreeable to us." In this he is corroborated by the evidence of the Buchanans, by that of Shute, Scholfield's executor, likewise by that of Rebecca Ellen Goodin, who testified that her father gave her the purchase price of $250 paid for the right of way, stating that it was her property. Goodin further testified that in order to be sure that they were entering into a legal contract with his father-in-law, he consulted eminent counsel, who advised him that the contract was valid.

Concerning the agreement with her father, plaintiff Rebecca Ellen Goodin testified to the effect that her father had said that:

"He had left me the place; that he had given me the place in the will. * * So after I came up here on one of the visits, before we had moved here, it was during the time that he still held 300 acres of land at Gaston, he said to me: 'Beck, I am going to give each of the other girls one hundred acres of that Gaston land.' He said: 'I am going to give you, or have given you, * * the old home place. The old home place is not worth as much as the Gaston land, it has

been farmed so long; it has been rented; there is only 87 acres of land there; but I consider the difference between the locations of where the old home place is and the Gaston place, it evens you about up with the other girls. You are only getting 87 acres but the girls are getting a hundred, but your location is just a little better than the other girls'.' He said it was ours to do as we pleased with it. And I asked him what we should do about this; I thought it was best to consult him; and he said: 'Do as you please; I have given it to you.' * * When we first went there he said: 'The buildings are so dilapidated I don't believe you can hardly live in them, but fix them up the best you can and maybe after a while you can put new buildings on the place.' He said one day when he was down there: 'Beck, I have given you this farm because I don't believe you will ever sell it.' "

She testified that in Astoria one day before moving up to the old home place to live, her father said:

"That he would be glad when we moved up there on to the farm; he had always looked forward to us moving there and * * making my home on the place. After he told me he had given it to me he said: 'Mother is having spells oftener of late and I want some of you children closer to us. If you are up on the farm, if we don't feel like living at home we can go and stay with you, and you will be handy to us, whenever we need one of you girls you will be close there where we can send for you.' He told me he had given it to me. He would always say: 'It is your home; it is your place.' * * He told us it was so badly run down it was going to be hard or worse every year, and he said, 'You better come up and live on it and improve it. * * The place is yours, and I expect Will to make improvements and pay the taxes, and pay me $100 a year.' He said at one time: 'I don't like, Becky, to have you pay that hundred dollars a year, but I am afraid the others would not like it if you did not.' He said: 'The Wards

101 Or.—28

have it the same way you have. Ward has two hundred acres and is paying 200 dollars a year and the taxes, and it would be right for you to pay about 100 dollars a year and the taxes.' We were to pay it to him during his lifetime, or, if Mother should outlive him, during her lifetime."

She further testified that the taxes and the hundred dollars a year had been paid according to the terms of the agreement. In reference to the Buchanans' deal for the roadway referred to above, she stated that her father had given her the money received therefor.

"I said: 'Father, that is not mine; the land is yours'; and he said: 'No, it is not, Beck. Before Will Goodin came on the place I told him that I had given you 87 acres of land, and I don't want it said when I am dead that I have robbed you out of one foot. There is that money that that acre and a fraction came to; you still have your 86 acres.' "

Witness then described the decayed condition of the dwelling-house situate upon the farm. She said:

"The year before we went there, there had been sheep on the place and they had used the house for a shed; they were running in the house and using it."

She gave evidence concerning the rebuilding of the old farm, of the repairing of buildings, and of the making of additional improvements. She testified that she would not have moved on the place but for the contract with her father, and from that understanding she was led to believe, from what her father said and did, that the property was to be willed to her; that he had declared to her that he was getting tired of receiving nothing out of it and said that Sholes would buy the farm, "and if you folks don't

come on it and run it I will sell it." She stated that he had said to her:

"*** That Hattie had moved to Portland and he wanted one of the children closer than the other one at Gaston, and he wanted me to live close there so if we were needed. * * That I was to get the farm after he passed away if we would go on the place, keep up the improvements and put them on and pay the taxes and give him $100 a year. He said: 'I have willed the place to you. It is your farm.' He would always make that remark. Whenever I would ask him about making any improvements he would say: 'Do what you please. It is your home.' "

Witness testified that after plaintiffs moved upon the farm the exclusive control and management of the same was in them.

Mary Jane Ward gave important testimony to the effect that the Goodins had the same kind of a contract for the home place that she had for her place.

Loren Porter, an old inhabitant of Washington County and a next door neighbor of the Scholfields, testified that Benjamin Scholfield told him that he had given the farm to the plaintiffs.

W. G. Hare of Washington County is an important witness. He was a nephew of Benjamin Scholfield and enjoyed friendly relations with all of the members of the family. He had assisted in redrafting one of the Scholfield wills. He had examined two of the wills and had knowledge of the agreement between the plaintiffs and the deceased. He was the attorney for the executor of the last will and testament of Benjamin Scholfield, deceased, and, being familiar with all the facts, and with the whole transaction, advised the executor to make no appearance in this suit. Mr. Hare's testimony strongly corrobo-

rates the claim made by the plaintiffs. He testified
to the circumstances of redrafting the will, which was
done at the request of Benjamin Scholfield so as to
eliminate a devise of real property in favor of Mrs.
Yoder and to substitute in lieu thereof a specific be-
quest of money. In this second will, as in the first, the
old home place was devised to the plaintiff, Rebecca
Ellen Goodin. He was not certain as to the date of
the second will, but was "positive that it was since
the Goodins came up here from Astoria." He fur-
ther testified concerning a number of conversations in
which Mr. Scholfield clearly indicated to him that the
old home place was the property of, or would be the
property of, the plaintiff Rebecca Goodin. He gave
testimony relating to the disappointment of the old
gentleman in regard to the tenant's permitting the
place to run down, and concerning the pleasure he
got out of the place after the same had been trans-
formed from a wilderness of weeds to a fertile farm
by Will Goodin. Witness stated that many times he
had heard Mr. Scholfield, when speaking of the place,
refer to it as Beck's, and to the Gaston property as
Ward's land and Ruth's land; that he had heard him
apply the names of his children to these different
places in many conversations. Among other con-
versations testified to, he said:

"He [Mr. Scholfield] was in my office many times.
I saw him when he would come to Hillsboro and
throughout those conversations and at different times
he has told me—referred to that place as Beck's, and
I knew he willed it to Becky. * * The Goodins and
Wards were both paying the taxes and they were to
pay him a small rental; he said he just needed
enough to take care of the old horse and something
for him and mother to go on; I don't know that he
told me the exact amounts, but it was some sum. * *

I know that he expressed pleasure with the way the Goodins were building up the place. I am positive of that.''

Witness testified that Mr. Scholfield, in referring to the place given to the Wards, as well as to that given to the Goodins, said that:

''They might as well have something out of it now, as to wait until I am gone.''

J. W. Shute, executor of the last will and testament, testified that Mr. Scholfield had told him many times that he intended to give that whole place to Beck.

Edward Ward, a son-in-law of Benjamin Scholfield, although an adverse party, gave testimony that corroborates the plaintiffs. He testified to a contract with Scholfield similar to that of the Goodins; to expending nine or ten thousand dollars upon the lands promised to be devised, and that his father-in-law carried out the agreement by willing the tract to Mrs. Ward, wife of witness.

Mrs. Cornelius, one of defendants, testified to a conversation with her as follows:

''I intended to give it to you, but Becky has asked me to give it to her and I have given it to her to keep peace. I think it would be better. * * I gave her that place and then I will give you the hundred acres. * * I will give Molly the other hundred,—that is Mrs. Ward.''

Mrs. Yoder, another defendant, testified, in response to this question:

''Q. How did he tell you he had fixed things then?
''A. He said that he had left the Gaston property, those three different parcels of one hundred acres each, to Mrs. Cornelius, Mrs. Ward and myself, and had given—and would leave the place, the home place, to Becky. He said: 'You know she wants it.'

"Q. Did he later tell you that he had made it out, made out a will and had given you three girls the place at Gaston and had given Becky the home place?

"A. That is the time.

"Q. You heard him say that?

"A. Yes, sir."

T. S. Cornelius, another defendant, testified that his father-in-law said to him that he intended to leave the home place to Becky.

William Scholfield, another defendant, testified that his father said "that the place was run down and he wanted it built up; that the renters took everything off and put nothing on; that at his death they [plaintiffs] would get the place if they took an interest in it and built it up. He said: 'You remember we had good crops here and the place can be built up again and make them a good home.' He said that Rebecca wanted it and he had made up his mind that she should have it."

William Tupper, a cousin of Mrs. Scholfield, testified that after the Goodins had moved on to the old home place Mr. Scholfield told him he had given it to Becky.

J. W. Reeves, ex-sheriff of Washington County, who had lived much of his lifetime in the vicinity of the Scholfield home, said that he had heard Mr. Scholfield say he wanted Mrs. Goodin to have the home place, and that it was his understanding from the conversation that Mr. Scholfield intended to leave a deed to Becky for the property so that when he died the old home place would go to her.

J. W. Goodin, county judge, and a relative of the plaintiffs, testified that Benjamin Scholfield had told him he had promised Becky the place provided they would move on the place and improve it, and that

something was said concerning rental and taxes which the witness did not remember.

Another neighbor, S. M. Chapman, testified that Mr. Scholfield was much pleased with the great improvement made by the Goodins in the condition of the farm, and that he said:

" 'Yes, he was very much pleased with the way Mr. Goodin was doing; but,' he said, 'he can afford to keep the place up for it is his place anyway, or his wife's place, when I am dead and gone; it will belong to her, and he can afford to improve it and keep it up.' * * He said that Mr. Goodin paid the taxes on it and gave him a little besides that; * * that the place was to go to Mrs. Goodin at his death."

The testimony shows that the plaintiffs are now, and ever since the tenth day of October, 1909, have been, in the lawful, open, notorious and exclusive possession of the real property in controversy, claiming the same under the terms of the alleged contract. For years after the contract was made, Benjamin Scholfield, by word, act and deed, recognized the binding force of the agreement he had made with plaintiffs. We have set down much of the evidence adduced upon the trial of the cause in the court below for the reason that the question involved is one of fact. Additional corroborative evidence could be recited, but brevity forbids.

All issues of law arising in this cause have heretofore been settled in Oregon. In a similar case, this court recently said:

"The issue is governed by such cases as *Barrett* v. *Schleich,* 37 Or. 613 (62 Pac. 792). Further citation of precedents is unnecessary. The principles are well settled. The cases are in harmony. They turn uniformly upon a question of fact and the suffi-

ciency of the acts of the parties to amount to part performance." *Hayes* v. *Hayes,* 89 Or. 630 (174 Pac. 579).

2, 3. The complaint alleges an oral agreement creating an interest in land. To remove the contract from the statute of frauds, plaintiffs rely upon possession, the making of substantial improvements on the farm, and other valuable considerations moving from them to Benjamin Scholfield. In order that such an agreement may be enforced by a court of equity, it must be clear, definite, certain, just, reasonable, and mutual in all its parts: *Odell* v. *Morin,* 5 Or. 96; *Brown* v. *Lord,* 7 Or. 302; *Wagonblast* v. *Whitney,* 12 Or. 83 (6 Pac. 399); *Knight* v. *Alexander,* 42 Or. 521 (71 Pac. 567); *Tucker* v. *Kirkpatrick,* 86 Or. 681 (169 Pac. 117). It has been accurately stated that the certainty of such a contract must be established by evidence, sufficient to satisfy a court of equity of the truth of the allegations of the complaint; but proof beyond a reasonable doubt is not required: *Goff* v. *Kelsey,* 78 Or. 337 (150 Pac. 103). When the condition of the old home place, the situation of the parties, their ages, relationship, and the health of the mother, are considered, the evidence given at the trial satisfies these requirements. It will be remembered that one of the reasons given by the father for wanting the daughter to take over the old home place was that she would then be near her aged mother during her illness. This is a part of the consideration that dollars cannot measure.

4, 5. Corroborating and confirming plaintiffs' claim under the contract, much evidence was offered and admitted of declarations against interest made by Benjamin Scholfield during his lifetime. This evidence was relevant and under the express provisions

of the Code was admissible: Sections 710 and 727, subd. 4, Or. L., and notes. Nevertheless, the oral declarations will be considered by the court with caution: *Stalker* v. *Stalker,* 78 Or. 291 (153 Pac. 52).

Some of the witnesses assert that a year or two before Benjamin Scholfield died, he changed his mind in the matter of devising all of the land constituting the old home place to the plaintiff Rebecca Ellen Goodin as he originally intended and as he had provided in at least two of his wills. The will in existence at the time of the contract and the one he made following the contract devised the land to Rebecca. The reason for altering the devise to the plaintiff is unknown to us. Each witness who testified concerning what the testator said about the matter gave a different reason. The change was without the consent of, and was unknown to, the plaintiffs. It was made after the plaintiffs had been in the exclusive possession of the farm for years, after they had made valuable improvements, paid the taxes and $100 a year, all in accordance with the contract, and after plaintiffs had changed the character of the soil from that of a weed bed to a highly cultivated farm. The plaintiffs had performed these acts in reliance upon the contract, and all things done by them toward improving the farm are referable to the contract.

6. The parties to the contract proved to have been made in the case at bar were competent to enter into that agreement; and, when made, the testator Benjamin Scholfield had no lawful right to alter his will so as to reduce the acreage of the old home place devised to Rebecca Goodin: *Kelley* v. *Devin,* 65 Or. 211 (132 Pac. 535); *Wood* v. *Dunn,* 81 Or. 471 (159 Pac. 1158).

In the Court of Chancery of New Jersey, it was said:

"Agreements for family arrangements with respect to property are viewed with favor by this court. They ought to be respected and scrupulously carried out by the parties to them, and if they are not a court of equity ought to enforce their execution." *Johnson* v. *Hubbell,* 10 N. J. Eq. 332 (66 Am. Dec. 773).

The decree appealed from is affirmed.

AFFIRMED.

BURNETT, C. J., and JOHNS and BEAN, JJ., concur.