Argued May 5; affirmed July 1; rehearing denied October 8, 1947

# VAN VLACK ET AL. *v.* VAN VLACK

(182 P. (2d) 969) (185 P. (2d) 575)

*George T. Cochran* (Cochran & Eberhard, of La Grande, on brief) for appellant.

*W. F. Brownton,* of La Grande, for respondents.

Before ROSSMAN, Chief Justice, and LUSK, BELT, HAY and WINSLOW, Justices.

ROSSMAN, C. J.

This is an appeal by Edward B. Van Vlack, proponent of a will executed by Hiram Lieurance, deceased, November 12, 1943, from a decree of the circuit court, sitting as a probate court, which held that (1) that will was not the last will and testament of the deceased; (2) it was revoked by another will executed by the deceased October 16, 1944; (3) the latter was the last will and testament of the deceased; and (4) the will of

October 16, 1944, should be admitted to probate as the last will and testament of the decedent. At the time of his death, June 11, 1946, Hiram Lieurance was a resident of Union County and was 92 years of age. The will signed by him November 12, 1943, devised his entire estate to Edward B. Van Vlack, the appellant. The will of October 16, 1944, which the attached decree holds to be the last will and testament of the decedent, made as its beneficiaries Charles E. Lieurance, Charles David Van Vlack and Edward Evert Van Vlack, the respondents. The latter, as well as the appellant, were nephews of the decedent.

No one questions the testamentary capacity of the deceased, nor does anyone suggest that any improper means were employed in procuring the execution of either of the aforementioned wills. The appellant claims that the instrument which he submitted was a contractual will. The one which was executed October 16, 1944, has not been found, and the appellant argues that the circumstances require a conclusion that the decedent destroyed and revoked it. Pursuing further his contention that the will of November 12, 1943, was contractual, the appellant urges that the will of October 16, 1944, was executed in violation of the purported contract and that, therefore, it should not have been admitted to probate. We shall refer to the will upon which the appellant relies as the 1943 will, and to the one upon which the respondents rely as the 1944 will. The latter contains a revocation clause.

As we said, the testator died June 11, 1946. Seven days later the appellant offered for probate in the county court for Union County the 1943 will. An order was entered June 18, 1946, admitting that will to probate in common form and appointing the appellant

executor. June 20, 1946, the respondents filed a petition in the county court which challenged the 1943 will as the deceased's last will and which offered for probate the 1944 will. That will nominated as executor L. H. Bramwell. The appellant replied to the petition filed by the respondents with an answer averring that the decedent executed the 1943 will in performance of an oral contract which he and the decedent effected in November of 1943, whereby it was agreed that the deceased would bequeath to the appellant his entire estate in consideration of the appellant and his wife "taking said decedent into their home and furnishing him a place to live in their home and waiting upon, nursing and taking care of him and furnishing him with the necessaries of life for the balance of his lifetime." The answer declared that the appellant and his wife faithfully performed their part of the agreement and that the decedent, in the performance of his promise, (1) executed the 1943 will, and (2) executed and delivered to the appellant and his wife a deed which conveyed to them all of his realty. The answer charged that because of the above circumstances the will upon which the respondents rely was null and void.

After the answer had been filed, the respondents moved for an order to strike from it the parts above reviewed on the ground that they did not constitute a defense to the probate of the 1944 will. At that juncture the county court, acting upon a motion made by the appellant, and obedient to § 13-502, O. C. L. A., transferred the proceeding to the circuit court. The latter sustained the respondents' motion. After a trial in the circuit court, which showed that both wills were duly executed and published, the decree was entered from which this appeal was later taken.

The appellant submits four assignments of error. They are:

1. "The Court erred in striking out the part of appellant's answer relating to the contract between appellant, Edward B. Van Vlack, and decedent, Hiram Lieurance."

2. "The Court erred in not finding that the testator, Hiram Lieurance, and appellant, Edward B. Van Vlack, entered into an oral contract about November 12, 1943, whereby appellant agreed to take testator into his home and care for him for the remainder of his life, in consideration of the testator bequeathing to appellant all of his property."

3. "The Court erred in admitting the alleged will of Hiram Lieurance, dated October 16, 1944, to probate, appointing L. H. Bramwell executor thereof, directing all property to be delivered to him and allowing contestants their costs and disbursements and in not holding said alleged will revoked, null and void."

4. "The Court erred in decreeing the will of Hiram Lieurance, dated November 13, 1943, revoked and of no force or effect, and in revoking the Letters Testamentary of Edward B. Van Vlack and in not decreeing said will to be valid and confirming said Letters Testamentary and in permitting contestants any costs."

Mr. E. M. Sabin, an attorney who maintains his office in Union, prepared both of the above-mentioned wills. According to Mr. Sabin, the decedent came to his office October 16, 1944, accompanied by Mr. Roy Lay, who became one of the attesting witnesses to the 1944 will, and presently said to Mr. Lay: "I wish you would stay here and hear what I have to say, and witness my will, because I am going to make a new will and I want you to witness it." Next, he spoke to Mr. Sabin in the following vein: "I want to draw

a will that Edward B. Van Vlack cannot break. Can you do it?" After an affirmative reply had been made, the directions for the will of October 16, 1944, were given. Mr. Sabin testified that he inquired of his client for the will which was signed in November, 1943, and was told that "he didn't have the November, 1943, will because he said Ed. Van Vlack got hold of it and wouldn't give it back to him. He said he asked him for it and couldn't get it." After Mr. Sabin had indicated that thirty minutes would be consumed in the work of typing the will, the decedent and Mr. Lay retired from the office. Later they returned and after the will had been read it was duly executed and published. The attesting witnesses were Mr. Lay and Mr. Sabin. Following the signing of the will, the decedent took it into his possession and said to Mr. Sabin: "I want you to go with me to the bank. I want to deliver it to Bramwell." Mr. Bramwell was the manager of the Union Branch of the First National Bank of Portland, and the decedent had frequently gone to him for advice. When the two reached the bank, the decedent, according to Mr. Sabin, handed the will to Mr. Bramwell and said:

"I have drawn a new will. * * * You are named as executor in this will. You can read it if you want to, but I want you to take care of the will, and you have charge of my affairs, and attend to this thing."

Mr. Sabin swore that Mr. Bramwell took the will and placed it in an envelope upon which he had typed words indicating that the contents were Mr. Lieurance's will. That having been done, Mr. Sabin returned to his office. As a witness, he produced his office copy of the 1944 will. It is one of the exhibits before us.

Mr. Lay's testimony was similar to Mr. Sabin's with the exception that he, of course, did not draft

the will and did not know what became of the will after it was signed.

Mr. Bramwell, referring to the decedent testified that "any time he had any particular papers to look after he usually came and talked to me about them." Prior to October 16, 1944, the decedent, according to Mr. Bramwell, told him that he made a will which devised everything to the appellant, and added:

"I feel that I have made a mistake. * * * Ed. Van Vlack has received from me everything that he is entitled to. * * * I feel an obligation to my other relatives * * * but Ed has my last will and I can't get it."

When Mr. Bramwell discerned that the decedent wanted to know whether the appellant's possession of the will would prevent the execution of another, he offered his opinion that a revoking will could be validly signed even though the beneficiary of the will to be revoked possessed it. Going on, Mr. Bramwell testified that some days later:

"Mr. Sabin and Mr. Lieurance came in my office, and Mr. Lieurance had the paper in his hand, and he says 'Bramwell,' he says, 'I have made a new will and,' he says, 'I have named you the executor in it, and I still want you to look after my affairs the same as you have done, and' he says, 'If anything happens to me, I want you to pay my bills immediately, and' he says, 'You can read the will if you want,' and I made the remark that I didn't care to look into the provisions of the will, so I took it as granted that what he told me in naming me in the will as executor was correct. With that, I reached in my desk drawer and pulled out a large white envelope, and on that envelope I typed the heading that this was the last will and testament of Hiram Lieurance, and the date, and while I was

doing that Mr. Sabin says, 'Well, there isn't anything more, so I'll leave.' I said to Mr. Lieurance, 'What you want to do with this will?' And he says, 'I want to leave it with you.' I says, 'Well, I really don't believe I should keep it.' I said, 'You have your safe deposit box. Why not put the will in the box?' and he agreed with my suggestion, and with that, he gave me the keys to the safe deposit box, and I went and got the box out and brought it and laid it on the desk, opened the lid, and we put it in the box. The lid was shut down and I went and locked it up and gave him back his key."

In that way the will was placed in the safe-deposit box.

Since the will was not found in the box when it was opened after the decedent's death, we shall now review the part of the evidence which speaks of the decedent's visit to the vault and the manner in which the bank operated its safe-deposit boxes.

We infer from the evidence that the safe-deposit boxes in Mr. Bramwell's bank were kept in a vault and that the customers had no access to the vault. When a customer wanted his box he gave his key to an employe of the bank who entered the vault and got the box. In order to get a box out of its aperture in the vault, two keys were necessary, one of which was possessed by the customer and the other, a master key, by the bank. Mr. Bramwell testified:

"The box was usually pulled out of the safety deposit compartment when he wasn't present, but the lid on the box was never opened only in his presence."

That testimony confirms our impression that an employee of the bank went into the vault alone and got the box. The lid of the box, which we assume was made of thin metal, was opened by the customer.

The routine which the decedent followed when he wished access to his box was thus described by Mr. Bramwell:

> "He usually came in my office and advised me as to what he wanted to do, whether he wanted to put anything in or take it out of the safe deposit box, and give me his key, and I would go and bring the box out and he would usually tell me to get out a certain paper or put one back in. His eyes were not good, not too good, and he usually left it to me to do whatever he wanted to do."

So far as Mr. Bramwell could recall, he was the only member of the bank's staff who ever waited upon Mr. Lieurance. However, he was not always in the bank during banking hours. The appellant recalled an occasion when a woman employee of the bank went into the vault and got the box. At that time his uncle wished to make an entry upon a mortgage which reposed in the safe-deposit box, showing receipt of an interest payment. He was accompanied by the mortgagor's daughter. The appellant testified:

> "My uncle and Lloyd Baker's daughter went in and sat down, and that lady brought the box and set it on the table in front of them."

Whether the bank had booths into which customers could retire while examining boxes is not disclosed by the evidence. It will be observed from the quoted language that the appellant said that the box was placed by the employee upon a table. Other witnesses also spoke of a table—whether it was in a private room or whether other things were upon it which might get mixed up with articles taken from the box by the customer is not disclosed by the record.

After the will had been lodged in the safe-deposit box, the decedent came to the bank a time or two and

had Mr. Bramwell get the box for him. Concerning those occasions and the will, Mr. Bramwell said:

> "I saw it in the box in the presence of Mr. Lieurance, at least once, after that time, and possibly two or three times."

He thought that the last time he saw the will in the box was "six or eight months before his death." He swore that the decedent never requested that the will be removed from the box and that he (Bramwell) never took the will out of the box. Continuing, Mr. Bramwell said that three or four weeks before his death the decedent requested him to come to his home, and described what there occurred in the following narrative:

> "He had nothing particular to talk about, other than what he had spoken about before. We talked about his health, and one thing and another, and he told me he was very bad, and he says, 'You know, Bramwell, you are my executor, and' he says, 'I am telling you again, that as soon as I pass away, I want you to pay every one of my bills immediately. I don't want to owe anything,' and then he says, 'You have instructions as to what to do with the rest of it.' "

Mr. Bramwell testified that before anything was undertaken looking toward the probate of the 1943 will:

> "I told him at that time that whether he knew it or not that I knew that there was a later will."

The same information was given by Mr. Sabin to the appellant's attorney. Notwithstanding that information, the appellant petitioned for his appointment as executor under the 1943 will and was appointed. Shortly thereafter he returned to Mr. Bramwell with a request that he be permitted to list the contents of

the safe-deposit box. Mr. Bramwell procured the box and placed it upon a table. While the inventory was in progress, Mr. Bramwell left the room and procured for the appellant from the bank's ledgers the balances in the decedent's commercial and savings accounts. When he returned the work of listing the contents of the box was resumed. No will was found in the box.

In a preceding paragraph we quoted the assignments of error and shall now consider the third of them, which claims that the circuit court should have held the 1944 will "revoked, null and void." In partial support of that contention, the appellant says:

> "The voluntary conveyance for a valuable consideration by one of all the property which he had antecedently bequeathed takes such property out of the operation of such will, and such testament is thereby impliedly revoked pro tanto. Watson v. McLench, 57 Or. 446, 451; Pape v. U. S. Bank, 135 Or. 650, 655; In re Wilson's Estate, 85 Or. 604."

The rule employed in those decisions is thus stated in Ann. Cas., 1913B, p. 57, in language quoted in the Pape decision:

> "It is a firmly established rule of the common law, which is recognized in most jurisdictions, that where a testator, subsequent to the execution of a will specifically devising lands, voluntarily conveys the lands by an absolute conveyance, the will is revoked pro tanto, or, otherwise stated, the specific devise fails as to the lands conveyed."

■ That principle is not applicable to the situation before us. Neither the 1943 nor the 1944 will contains a specific devise of land, and the decedent, Hiram Lieurance, transferred no part of his estate after he executed the 1944 will. Whatever he possessed on the day he signed that instrument he retained when death

overtook him. It may be, as the appellant claims, that the 1943 will is a contractual instrument and that an agreement was made by him and his uncle under the terms of which the appellant is entitled to all of his uncle's estate, but even if both of those propositions are true, the 1944 will is a valid non-revoked instrument. The above-quoted words include the following: "the will is revoked pro tanto." Since the decedent conveyed nothing after he published the 1944 will, those words, if applicable to the situation before us, would mean that a will can be revoked before it is written. The quoted words pertain only to instances where the testator, "subsequent to the execution of a will," conveys lands mentioned in a specific devise. We are satisfied that the rule upon which the appellant depends is foreign to the facts before us.

In support of this assignment of error, the appellant's principal contention is:

"Where it appears that a will was executed by a decedent and that it was last seen or heard of in his custody or in a place to which he had ready access, but after his death it cannot be found, it must be presumed, in the absence of other evidence, that he destroyed it in his lifetime with the intention of revoking it. 68 C. J. Wills, 992, § 759; In re Miller's Will, 49 Or. 452, 456; In re McCoy's Will, 49 Or. 579; Flanders v. White, 142 Or. 375, 381."

The citations support the general rule which the appellant attributes to them.

■ We think that anyone, whether he be a judicial officer or a layman unschooled in the law, would infer that a decedent had evidently destroyed his will when, after death, the will could not be found in the repository in which he had placed it and over which he exercised

control. The strength of the inference obviously would be dependent upon the control which the decedent possessed over the repository and the access which others had to it. From 2 Page on Wills, p. 720, § 873, we quote:

> "If the will is not in the custody of testator, but he has ready access to it, there is a greater chance that it may have been destroyed by someone other than testator; but the courts apparently feel that the chances in favor of its destruction by testator are greater than the chances in favor of its unlawful or criminal destruction by another; and the presumption that testator destroyed it with the intention to revoke it exists."

We deem it unnecessary to determine whether the word "presumption" or the word "inference" is the correct one to identify the assumption drawn from the facts to which we have been alluding. If the assumption is a presumption of law, that fact would not prevent the mind from drawing from the same circumstances an inference that the decedent destroyed his will. Presumptions and inferences are often companions and frequently are based upon identically the same facts; the one is a creation of the law and the other is a conclusion drawn by the reasoning faculties. The only issue before us, as we shall presently show, is whether the assumption has been overcome and, therefore, we deem it unnecessary to determine its true character. As we proceed we shall generally use the words "presumption" and "inference" interchangeably.

██ October 16, 1944, the decedent lodged the will which he executed that day in a repository to which no one had access without the use of his key. After it was placed there Mr. Bramwell saw it in the box upon at

least one later occasion. Therefore, the fact that the will was not found in the box after the decedent's death warrants a presumption that the decedent destroyed and revoked it. We shall engage in that presumption. Presumptions, being creatures of the law, have whatever strength or cogency the law gives to them, but the strength of inferences is dependent upon the human experience which lies back of them. Let us determine, therefore, how logical it is to presume that some time after October 16, 1944, the decedent returned to his box, removed his 1944 will and destroyed it.

It may be that the will got out of the box unbeknown to the decedent. His eyesight was bad and he may have mistaken the will for some other paper which he intended to remove from the box. It may be that the large quantity of papers which the decedent kept in his bureau drawers included the will and that it was placed there by him in ignorance of its true character. Or it may be that the will fell to the floor of the bank or got mixed with papers on the table while he was examining the contents of the box. The appellant swore that his uncle was continuously losing things at home, such as his purse, and, since even people who have good eyesight occasionally lose papers while examining their strongboxes, it may be that the will escaped from its receptacle in that way. As we have seen, the box was sometimes opened in the presence of Mr. Bramwell. Upon one occasion, the daughter of a debtor of the deceased was present when the latter removed a mortgage from the box. After the deceased's death the appellant was present when the box was examined. No one claims that anyone fraudulently or wrongfully removed anything from the box, and, clearly, we would

not be justified in believing that the will disappeared in such a way. See 2 Page on Wills, p. 720. However, the presence of other persons in a small space while an aged person, afflicted with poor eyesight, is handling his valuable papers makes it easier for him to misplace something or to get his papers mixed up with others that are at hand. In short, there were means, other than intentional destruction by the decedent, whereby the will could have got out of the safe-deposit box.

We have mentioned the fact that when the decedent was overtaken by his last illness he sent for his trusted friend, Mr. Bramwell. No emergency had arisen which required attention, but, since he never expected to visit the bank again, it seems evident that he wanted to speak once more to the friend whom he had named as his executor. In the decedent's last days Mr. Bramwell remained, so far as the record discloses, as the only friend in whom he confided concerning matters of importance. Upon the occasion just mentioned the decedent had a matter concerning which he seemingly wanted to reassure himself, and he broached it by saying to Mr. Bramwell: ''You know, Bramwell, you are my executor.'' Shortly he continued: ''I am telling you again that as soon as I pass away, I want you to pay every one of my bills immediately. * * * You have instructions as to what to do with the rest of it.'' A year or so before those words were spoken, the decedent had handed to Mr. Bramwell the 1944 will and had suggested that he read it. It made Mr. Bramwell executor. On other occasions the decedent reminded Mr. Bramwell that he was to be executor. The decedent evidently attached importance to that fiduciary capacity and to the fact that Mr. Bramwell would assume the responsibility. It seems apparent

that the reason why the decedent sent for Mr. Bramwell was that he wanted to speak to his executor once more before death entered the door.

After the above-quoted words were spoken the decedent never returned to the safe-deposit box. Manifestly, he thought that the 1944 will, which appointed Mr. Bramwell executor, was in the box. Had he had any other belief, he surely would have mentioned it to his trusted friend. It seems obvious that if he had revoked the 1944 will he would not have said to the man whom he deemed his executor, "You know, Bramwell, you are my executor."

■■ The declaration which we quoted was admissible: *McCoy's Will*, 49 Or. 579, 90 P. 1105. Like most declarations that come from occasions where death hovers nearby, the quoted words assume the peculiar cogency which comes from the solemnity of the moment. We think that the declaration shows that the decedent had not intentionally destroyed his 1944 will and that he never intended to revoke it. What became of the 1944 will, we do not know, but witting destruction of it by the decedent is only one of many possibilities that may account for its disappearance. Although that possibility is favored by the presumption of which we have taken note, yet it is highly improbable. We are satisfied that the presumption that the decedent destroyed and revoked the 1944 will was overcome by the declaration which he made to Mr. Bramwell. We quote from *Miller's Will*, 49 Or. 452, 90 P. 1102:

> "Especially is this true when shown that within a short time before her death declarations were made by the decedent to the effect that the will was still in existence and in the bank, after which she could not have had access to it."

We conclude that the evidence fails to show that the 1944 will was revoked, and we further conclude that the third assignment of error is without merit.

We come now to the first assignment of error. It will be recalled that it is based upon a contention that the circuit court erred when it struck from the appellant's answer the part which alleged that the 1943 will was of a contractual nature, that it was executed by the deceased in performance by him of his part of an alleged contract, that the 1944 will was signed by the decedent in disregard of the agreement and that it was, therefore, "null and void and of no force and effect." The appellant concedes that normally the procedure which a beneficiary of a revoked contractual will must employ to secure the things which were promised him is a suit for specific performance or an action for damages. He terms the suit for specific performance and the action for damages as "roundabout procedure" and says that "admitting the 1944 will to probate is an empty form." The appellant urges that he was entitled in the present proceeding to prove that the 1943 will was contractual and to receive a decree awarding him the entire estate.

*Walker v. Yarbrough,* 200 Ala. 458, 76 So. 390, which the appellant cites, lends support to his position. In that case, the appellant—the surviving husband—offered for probate an instrument which his deceased wife signed December 17, 1907. The document is quoted in the opinion and appears to be a combination deed and bill of sale. The dissenting opinion termed it "a deed, not a will." It recites a consideration and has none of the appearances of a will. The probate court admitted it to probate. A month later the respondents, who were brothers and sisters of the

deceased, offered for probate a will executed by her July 3, 1915. The court declined to probate it. At that juncture the respondents filed a bill in equity in which they alleged that the will of December 17, 1907, was not the last will and testament of the deceased, and that the one which they propounded, being the one executed July 3, 1915, was her last. They averred that it revoked the earlier one. Their bill prayed that the probate of the will of December 17, 1907, be set aside and that the will of July 3, 1915, be admitted to probate. The appellant demurred to the bill. The demurrer was overruled and from the resulting decree the appellant appealed. In reversing the decree, the decision said:

> ''Here, we are not concerned with the question of a mere contract or agreement to make a will for the reason that the bill shows upon its face a will that has been duly executed, based upon a valuable consideration, and has already been duly admitted to probate. There is no occasion, therefore, for a resort to the remedy of specific performance. Indeed, the beneficiary neither needs nor seeks any relief, but he merely stands upon his rights under the probated will, which he insists is valid and binding, and which could not be revoked by the execution of a subsequent will. If it appears, therefore, that the will is valid and binding, based upon a valuable consideration, accepted by the testatrix, and therefore irrevocable, and has already been probated, clearly it would seem the beneficiary is without the need of any aid of a court of equity, and may stand upon his legal rights.''

Our search through the later Alabama decisions has disclosed no case which employed the short-cut route which this decision apparently blazed.

*Cobb v. Hanford,* 88 Hun. 21, and *Chase v. Stevens,* 34 Cal. App. 98, 166 P. 1035, which are not cited by

the appellant, employed principles somewhat similar to those which were used in the Walker decision.

The appellant believes that *Engle's Estate,* 129 Or. 77, 276 P. 270, supports his contentions. That decision arose out of a contest of a will signed by the decedent February 19, 1921. The beneficiary, Laura B. Pittenger, claimed that the instrument was executed pursuant to an agreement whereby she bound herself to provide a home for the decedent for the remainder of his life, and he agreed to bequeath to her the farm which the will described. Two months after the execution of the will the decedent signed a deed which lent further support to her contentions. In August, 1921, he executed a will which could not be found after his death, but which contained a revocation clause. June 1, 1928, the decedent signed a codicil which, after mentioning the will of February 19, 1921, and the aforementioned deed, said that if anyone should "presume to contest the said instruments or either of them or this codicil" he should be deprived of any interest in the estate. Before signing the codicil he displayed to its draftsman the will of February 19, 1921, and the deed. The circuit court held that the will of February 19, 1921, was the decedent's last and granted it probate. In sustaining its order, this court employed the following language upon which the appellant relies:

"This position does not avail the contestants for two reasons. First, the provision in a will devising land pursuant to a contract to devise the same, executed in confirmation of the contract, cannot be defeated by a subsequent revoking devise: 40 Cyc. 1088; Stevens v. Myers, 91 Or. 114 (177 Pac. 37, 2 A. L. R. 1155); Nash v. Harrington, 110 Kan. 636 (205 Pac. 354).

"Where a testator has made his will in compliance with an agreement to devise land for a valuable

consideration, such as his care and maintenance, during the remainder of his life, he has no lawful right to make a later will, contrary to his agreement, after its performance, or a large part of its performance by the devisee: Goodin v. Cornelius, 101 Or. 441, (200 Pac. 915); Kelley v. Devin, 65 Or. 211, (132 Pac. 535); Woods v. Dunn, 81 Or. 457, (159 Pac. 1158).''

After the decision had made those observations it held that the execution of the codicil was a republication of the will of February 19, 1921. It seems clear that the decision was based largely upon the latter premise.

It will be observed that the language upon which the appellant relies does no violence to the authorities, unless one seeks to deduce from it a rule that the beneficiary of a revoked contractual will can employ it as a means of preventing the probate of the revoking will. We shall shortly return to this decision.

■ The four decisions last mentioned constitute the only support of which we are aware for the rule which the appellant favors. Such a rule would run counter to the well-established principle that in a probate court all wills are deemed revocable: *In re Wilson's Estate,* 85 Or. 604, 167 P. 580; *Rose v. Oliver,* 32 Or. 447, 52 P. 176; 1 Page on Wills, p. 158, § 71; 4 Page on Wills, p. 833, § 1709. Further, a beneficiary of a contract will who receives the estate or bequest in the probate court can conceivably be deemed subject to a different application of inheritance and transfer taxes than one who works out his rights in a court of general jurisdiction. See Applicability of Inheritance Taxation to Contracts to Devise or Bequeath, 37 Yale L. J. 108, and notes 12 Minn. L. Rev. 192, 14 Minn. L. Rev. 430, and 30 Col. L. Rev. 745.

Moreover, a probate court, whether sitting in its ancient home or in the courtroom of our circuit court, is one of limited jurisdiction. Its procedure is ill adapted to framing the issues of such a complex controversy as seemingly exists between the appellant and those who oppose him. A meritorious beneficiary of a contract will can be pardoned for looking askance upon the procedure which he will have to pursue to gain the estate, but the simple procedure of a probate court may be inadequate to protect the rights of the heirs against the designs of a fraudulent claimant who comes in the guise of a contract beneficiary. Then, too, a probate court may not have at its avail a suitable remedy for a meritorious beneficiary. If he should choose to submit a claim expressed in dollars and cents covering the value of his services, the court could readily grant him justice, but most contract beneficiaries do not submit such claims. We quote from 68 C. J., Wills, p. 589, § 287, as follows:

"Thus, where the requisite circumstances exist, he may rest his claim upon the contract as such, either bringing an action for its breach, or seeking a remedy in the nature of a specific performance of its terms, or urging the contract, in the lifetime of the promisor, as the basis for appropriate equitable relief; or he may, in a proper case for such relief, without asserting the express contract as the basis of his claim, seek a recovery in the nature of a quantum meruit for the goods or services which he has rendered by filing his claims and having them enforced as claims against decedent's estate or in an action on the common counts, or an action on the account annexed, or an equitable proceeding seeking similar relief. * * * The promisee may set up the claim as a defense to an obligation held against him by the estate, where the decedent's contract was that he should be relieved from the

payment thereof, or may urge it as a counterclaim when sued on the obligation. * * * While there is some authority holding that, where a will is made pursuant to a contract, the promisee may enjoin the probate after the testator's death of a later will revoking it, there is other authority holding that the contract cannot be made the basis for enjoining probate. It cannot be set up, in proceedings in probate, to defeat the probate of the will even though an earlier will complying with the contract and revoked by the later one has been made and erroneously admitted to probate.''

■ The statement just quoted is also the law of this state, as is apparent from one of our recent decisions: *Ankeny v. Lieuallen,* 169 Or. 206, 113 P. (2d) 1113, 127 P. (2d) 735. We quote from the latter as follows:

"Referring now to our own decisions, this court, speaking through Mr. Chief Justice McBride, in In re Burke's Estate, 66 Or. 252, 134 P. 11, after holding that the contestants in a will contest cannot try out the question of whether the wills were mutual and based upon an agreement that the survivor should leave his or her property to a particular person, said: '* * * Such an agreement is valid if performed by the making of such wills and the acceptance by the surviving party of the fruits of the agreement, but it is valid only as a contract, the performance of which by one party and acceptance by the other has taken it out of the statute of frauds: 40 Cyc. 2117, 2118.' "

The decision in *In re Burke's Estate,* 66 Or. 252, 134 P. 11, continued as follows:

"It is no objection to the probate of a will that it violates such an agreement, or revokes a former will made in pursuance of it. While such former will is revoked as a will, it still stands as evidence of the contract. In fact, it is held in some instances that the revoking will must be first probated before

a suit to enforce specific performance of an agreement under mutual wills can be enforced: 40 Cyc. 2119.''

What is there said represents the general rule: 4 Page on Wills, p. 833.

 We are satisfied that *In re Burke's Estate,* correctly states the rule which is applicable to this proceeding. The loose language employed in *Engle's Estate,* supra, and quoted in a preceding paragraph of this opinion, must not be interpreted as declaring that a contractual will is irrevocable and can prevent the probating of a later will. All implications to that effect are withdrawn and overruled. The quoted language means that the contract which underlies the contractual will, and of which the latter is evidence, is enforceable, even though the will itself is revoked. In short, a contract to make a will, when based upon sufficient consideration, is irrevocable, although the will which was executed pursuant to it remains revocable.

We shall now pause for a moment upon the appellant's claim that to appoint an executor of a revoking will is ''an empty form.'' An executor, and even a person who is nominated in an unprobated will as executor, has duties to perform. For instance, a person who possesses an unprobated will must, upon the death of the decedent, deliver it ''* * * or to the executor named therein'': § 19-201, O. C. L. A. A person who is named in a will as executor may petition for the probate of the document: § 19-202, O. C. L. A. We now quote from 2 Page on Wills, p. 181, § 625:

''The executor, under the practice now prevalent in most states, should be a party to the contest, and may defend the will. He is said to be a necessary party.''

See also 21 Am. Jur., Executors and Administrators, p. 496, § 223. When an executor in good faith defends a contest of the will which nominated him, even though his efforts prove to be unsuccessful, the court may order the estate to reimburse him for his expenses: *In re Johnson's Estate,* 100 Or. 142, 196 P. 385, 196 P. 1115. Thus, the appointment of an executor for a will which revoked a contractual will is not a vain act. It may be that the decedent in the case at bar was anxious to have Mr. Bramwell become executor of the revoking will so that in the event of its contest it would be defended by one in whom he reposed confidence.

■ As we said, we believe that *In re Burke's Estate,* supra, was correctly decided. We decline to embrace the rule announced in *Walker v. Yarbrough,* supra, *Cobb v. Hanford,* supra, and *Chase v. Stevens,* supra.

The foregoing suffices as a disposition of all the assignments of error. Although this opinion does not mention all of the authorities cited in the appellant's able brief, all have received careful attention.

The decree of the circuit court is affirmed.

Submitted on petition for rehearing, filed August 14, 1947.

*George T. Cochran* (Cochran & Eberhard, of La Grande, on brief), for appellant.

*W. F. Brownton,* of La Grande, for respondents.

Before ROSSMAN, Chief Justice, and LUSK, BELT, HAY and WINSLOW, Justices.

ROSSMAN, C. J.

A petition for a rehearing filed by the appellant is before us. It is based upon five propositions, the essentials of which are a contention that when the circuit court adjudicates upon a contested probate matter which was transferred to it by the county court under the provisions of § 13-502, O. C. L. A., it exercises the jurisdiction of the circuit court and not the limited powers of the county court. The contention is governed by § 13-502, O. C. L. A., which says:

"Any contested probate matter in the county court, other than upon a creditor's claim for less than $500, shall, on motion made and filed by any party in interest, or on motion of the county court, at any time prior to the commencement of trial thereof on an issue of fact, forthwith be transferred by the county court, by order entered in its probate journal, to the circuit court in and for the county in which is pending the probate proceeding out of which such contest arose, and therein proceed and be tried and determined in the same manner and with like effect (except as hereinafter otherwise provided) as though it were proceeding and being tried and determined in the county court; and, to that end, there hereby are conferred upon and vested in, the circuit court, exclusively, in, and as to, such transferred, contested probate matters all the jurisdiction and powers pertaining to a court of probate heretofore possessed in the first instance by the county court, provided, however, that upon the final determination of such transferred, contested probate matter, the county court shall resume jurisdiction thereof, and pending such determination, * * *. Ipso facto upon any such transfer, all the records, files and proceedings in and of the county court in such probate proceeding out of which arose such contest pertaining or germane to such contested matter shall become likewise, and remain, the records, files and proceedings in and of the circuit court so sitting in probate, * * *."

It will be recalled that this proceeding was begun in the county court for Union County and that an order of that court, based upon a motion made by the appellant, transferred the matter to the circuit court. The appellant made his motion after the respondents had moved in the county court for an order to strike from the appellant's answer averments which set forth that the will of 1943, upon which the appellant depended, was contractual in nature. The motion to transfer was sustained. Prior to that the following had occurred: (1) The appellant offered for probate in the county court the 1943 will; (2) the court admitted that will to probate in common form; (3) the respondents filed a petition in the county court which not only challenged the 1943 document as the deceased's last will, but which also offered for probate the 1944 will; and (4) the appellant then filed the answer to the petition of the respondents which we have already mentioned.

Epitomized, § 13-502, O. C. L. A., provides:

"Any contested probate matter in the county court, * * * shall, * * * forthwith be transferred by the county court, * * * and therein proceed and be tried and determined in the same manner and with like effect * * * as though it were proceeding and being tried and determined in the county court; * * *. Ipso facto upon any such transfer, all the records, * * * in such probate proceeding * * * shall become likewise, * * * the records, * * * of the circuit court so sitting in probate, * * *."

This statute is couched in terms which are familiar to all. The grammatical arrangement is commonplace. The phrases "the same manner" and "like effect" are often employed in legislation and receive from the

courts their ordinary meaning, unless employed in an unorthodox way. See 38 Words and Phrases, Perm. Ed., 222, and 25 Words and Phrases, Perm. Ed., 283. In this statute the two terms are used in the same way as they occur in ordinary speech. The phrase, ''proceed and be tried in the same manner and to like effect as though it were proceeding and being tried and determined in the county court'' plainly means that when a contested probate matter is transferred by the county court to the circuit court, the latter in adjudicating upon it does not employ its general powers but only those of the county court. In passing upon the contested probate matter, the circuit court judge for the time being possesses only the powers of a county judge. In fact, the statute describes his court in these words: ''circuit court so sitting in probate.'' In order to assure his court of the powers needed to pass upon the transferred item, the statute says: ''and to that end, there hereby are conferred upon, and vested in, the circuit court, exclusively, in, and as to, such transferred, contested probate matters all the jurisdiction and powers pertaining to a court of probate * * *.'' We are satisfied that this statute means what it plainly says; that is, that when the circuit court adjudicates upon a transferred, contested probate matter it exercises only the limited powers of the county court.

A county judge need not be a member of the legal profession. Most of the work which he performs is administrative. The purpose of the above act is to afford the parties, and even the county judge himself, an opportunity to have a man learned in the law and experienced in presiding over trials, adjudicate upon contested probate matters which are subject to § 13-502, O. C. L. A.

The appellant, in arguing in support of his petition for a rehearing, claims that our holding that the circuit court, in hearing a matter transferred to it by § 13-502, exercises only the powers of a probate judge, is counter to *Re Pittock's Estate*, 102 Or. 47, 201 P. 428; *In re Will of Pittock*, 102 Or. 159, 199 P. 633; and *Re Faling Estate*, 113 Or. 6, 228 P. 821, 231 P. 148. He calls attention particularly to the following which appears in our opinion in the instant case: "Moreover, a probate court, whether sitting in its ancient home or in the courtroom of our circuit court, is one of limited jurisdiction." That sentence had reference to matters transferred to the circuit court for adjudication pursuant to the provisions of § 13-502, O. C. L. A.

The Pittock and Faling decisions arose out of probate proceedings which were begun in Multnomah County. Chapter 59, § 1, General Laws of Oregon, 1919, which is now § 93-230, O. C. L. A., added one more department to the circuit court in all counties "having over 100,000 population," which, of course, meant Multnomah County. Section 2 of that act, being now § 93-231, O. C. L. A., provided that the additional judge "shall sit in a department to be designated by the rule of the circuit court by an appropriate number, and shall be known as the department of probate, but the judge of such department shall, in addition to the duties in this act prescribed, perform the general duties of a judge of the circuit court." Section 3 of the act (§ 93-310, O. C. L. A.,) says:

"In all judicial districts within the state of Oregon comprising one county only, as over 100,000 population, the county court of such counties, and the office of county judge therein, are hereby abolished, and the present incumbents of such offices are hereby created circuit judges of such

judicial districts, and are hereby appointed to sit as circuit judges in the department provided for in section 93-231, to be known as judges of the department of probate, * * *."

The statute (§ 13-502, O. C. L. A.,) which governs this proceeding and the one which governed the Pittock and Faling decisions did not effect any change in probate procedure and the manner of probating wills. In all counties of this state the same procedure must be followed from the day that a will is offered for probate until the estate's representative is finally discharged. The title of the court in which the procedure is pursued is immaterial. The official who sits upon the bench is a judge of probate, regardless of whether his court is entitled a county court or a circuit court. Everything that was done in the Pittock and Faling decisions relating to the probating of the wills could have been done by any probate judge of this state, and nothing that was said in the Pittock and Faling decisions authorized this appellant to pursue the course which he undertook. Our previous decision, with sufficient clarity, we believe, points out the course to be pursued in proceeding with a contractual will.

The appellant has objected to the cost bill filed by the respondents. He suggests that the costs should be defrayed out of the assets of the estate. We know of no reason for embracing that suggestion.

The petition for a rehearing and the objections to the cost bill are denied.