Argued February 18, reversed and remanded with instructions
April 29, petition for rehearing denied June 8, 1971

IN THE MATTER OF THE ESTATE OF
CLARENCE P. EDWARDS, DECEASED.

FRY, *Appellant, v.* EDWARDS, ADMINISTRATOR,
*Respondent.*
484 P2d 322

*John R. Faust, Jr.,* Portland, argued the cause for appellant. With him on the briefs were Cake, Jaureguy, Hardy, Buttler & McEwen, Portland.

*George L. Dukek,* Fossil, and *Claud Ingram,* John Day, argued the cause and filed the brief for respondent.

Before SCHWAB, Chief Judge, and FOLEY and FORT, Judges.

FOLEY, J.

The plaintiff, Clarence W. Fry, sole beneficiary under a will of Clarence P. Edwards, deceased, petitioned the circuit court to admit to probate a conformed copy of the will, the original of which had disappeared. The circuit court refused to admit the conformed copy of the will to probate and plaintiff appeals.

Clarence P. Edwards, a retired rancher who lived in Condon, Oregon, died in a nursing home in The Dalles, Oregon, on Wednesday, April 9, 1969. At the time of his death he had one brother—Fred Edwards, the administrator of decedent's estate and defendant

herein—two sisters and some nephews and nieces. He had never been married. There is strong evidence that the plaintiff, Clarence W. Fry, was decedent's illegitimate son, though no action to establish this relationship had been undertaken. See ORS 109.060 and 109.070.

Decedent first advised plaintiff, Clarence W. Fry, that he was plaintiff's father in July of 1965. At that time decedent also advised plaintiff that he would share in the decedent's estate, subject to an obligation the decedent felt to provide for decedent's housekeeper, Mrs. Perry. On November 23, 1965, decedent executed the will naming Clarence W. Fry as his sole beneficiary. The will was prepared by William Bennett, a Condon attorney, who had prepared other wills for decedent commencing in 1952. A second will was prepared and executed in 1961. A third was prepared early in 1965 making provision for decedent's housekeeper, Mrs. Perry, but she died in 1965 prior to its execution. The fourth will, executed by decedent November 23, 1965, is the one which is the subject of this proceeding. All of decedent's wills named First National Bank of Oregon as executor and each of the wills revoked all prior wills.

The original of this last will was handed by attorney Bennett to decedent on November 23, 1965, when he left the attorney's office after executing the will. Decedent entered his safety deposit box that day in the Condon branch of the First National Bank of Oregon. He later told Mr. Fry, so the latter testified, that "he had made it out and put it in the bank." Attorney Bennett testified that he had advised decedent he was sending a copy of the will to First National Bank of Oregon which acknowledged receipt of a copy of the will November 24, 1965.

During the period between the execution of this will and decedent's death on April 9, 1969, decedent and plaintiff exchanged occasional visits and frequent correspondence. Plaintiff was at all times a resident of Centralia, Washington, while decedent resided in Condon, Oregon. Plaintiff testified that decedent told him he was his father in July 1965, at a meeting arranged by decedent with plaintiff in decedent's home in Condon. In July 1966, plaintiff testified he and his family visited decedent in Condon and decedent took them on a trip to John Day and Ritter Hot Springs. Plaintiff testified decedent told him on that occasion that he had willed to plaintiff everything he had.[1]

Clarence Fry testified about several visits thereafter. Decedent visited the Clarence Fry family in Centralia, Washington, in the fall of 1966. In January of 1967, he attended the wedding of Fry's daughter in Centralia. In July of 1967, the Fry family visited decedent in Condon for several days. Just before Halloween in the fall of 1967, decedent visited Fry in Centralia for two days. Sometime during the course of each of these visits, Fry said, decedent mentioned the will and said, "If anything happens to me, see Mr. Bennett and the banker."

On June 15, 1968, decedent wrote Fry inviting him to attend the 4th of July celebration in Condon, but Fry testified that business reverses prevented him from coming. Decedent did not again visit Fry in

---

[1] At the time of the execution of the will in November 1965, decedent had not told attorney Bennett why he was willing his property to Clarence W. Fry. On August 4, 1966, Bennett testified, decedent came to his office and told him who Clarence W. Fry was. Bennett made the following notation of that conversation: "8-4-66, C. P. Clarence W. Fry, his son, born in 1909. Did not give name of mother, other than that she later married twice. Clarence W. took name of first husband."

Centralia, nor did Fry visit decedent until after decedent had entered the hospital in The Dalles the following October. Fry testified that he and his wife and boy traveled to The Dalles and visited decedent in the hospital, that at that time, also, decedent mentioned the will and said "if anything ever happened to him, to see Mr. Bennett and the banker." Thereafter he visited decedent in the nursing home shortly after decedent's birthday, which was in February. That was the last time Fry saw him prior to his death.

Meanwhile, after decedent entered the hospital in The Dalles in October 1968, he asked his brother, Fred Edwards, defendant herein, to handle his business affairs while he was hospitalized. For this purpose, decedent gave a power of attorney to his brother Fred, who, for the same purpose, obtained the key to decedent's safety deposit box from decedent's home in Condon. From October 1968 forward, defendant Fred Edwards had access to decedent's home and safety deposit box. During this period until his death on April 9, 1969, decedent was in either the hospital or nursing home in The Dalles and never returned to Condon during his lifetime.

The defendant entered the safety deposit box five times between October 1968 and the date of decedent's death. Generally, his purpose in entering was to remove time deposit certificates to insure continuity of accrual of interest. He testified he did not see a will in decedent's safety deposit box. He also testified that someone from the bank was with him on each occasion when he entered the box. Three different members of the bank personnel signed as vault custodians at the times of the defendant's five entries into the box. Only one of them, Mr. Wiley, the bank manager, testi-

fied at the hearing. He signed as vault custodian on only one of the five entries, though he thought he was present at one or two of the other entries. He further testified that although it was his understanding that some bank employe was present with defendant at each entry, he did not know of his own knowledge what was removed from the box on the occasions when he was not personally present. None of the other bank personnel testified.

Defendant Fred Edwards testified that although he and his brother were close and at one time had been partners in business, decedent at no time discussed with him whether he did or did not have a will. In short, decedent did not confide in his brother Fred anything about his testamentary intentions, past or current.

After the death of decedent on Wednesday, April 9, attorney Bennett, on Friday the 11th or Saturday the 12th, called the defendant by telephone and advised him of the will in question. Defendant then contacted attorney Dukek and on Monday, April 14, the safety deposit box was again entered by Fred Edwards, in the presence of attorney Dukek, Mr. Fisher, the bank operations officer, and others, and no will was found. The box was inventoried at that time. On that same day, April 14, after the funeral, a petition prepared by attorney Dukek was signed by the two sisters of decedent requesting defendant's appointment as administrator of the estate. The petition alleged that they had made a diligent search for a will but had found none. Defendant Fred Edwards was then appointed administrator by a county court order filed Tuesday, April 15, 1969.

Mr. Robert Marcy, a trust officer for the First National Bank of Oregon, having learned of decedent's death by letter from attorney Bennett, arranged a meeting at the bank in Condon with defendant Fred Edwards, Mr. Bennett, the Frys and himself for April 16, 1969. Mr. Marcy testified that the primary purpose of the meeting was to look through Mr. Edwards's things to see if the original will could be found. They looked through the safety deposit box again, and then Fred Edwards and Marcy went to Clarence Edwards's house to look for the will. Mr. Marcy testified that neither the Frys nor attorney Bennett accompanied them to the Clarence Edwards home to search for the will because "it was Mr. Edwards' expressed desire that they not accompany us." Mr. Marcy stated that they went through three or four stacks of papers in the kitchen but found no will there.

The defendant presented two witnesses in support of the claimed revocation of the will. Judge James Burns, County Judge of Gilliam County, a long-time acquaintance of decedent, said Clarence Edwards, in a conversation shortly before he went to the hospital, "gave * * * [him] the impression" that he had no will. Also, Walter Seale, 81, long-time (60 years) resident of Condon and friend of decedent, testified that decedent told him in a casual conversation about 14 or 15 months before his death:

"And I said, 'I guess you have a will, also.'
"And he says, 'No; I don't.'"

Seale got the impression from his conversation that decedent had never had a will.

Neither of these witnesses testified that decedent spoke of having had a will and of having revoked it.

Rather the inference was that making a will would be a new thing. Judge Burns said:

"And when I mentioned that he should have one, he said, 'Well I'm going—I'll take care of that.' "

The question to be determined is whether or not decedent revoked the will in favor of Fry of November 23, 1965, in light of the fact that the original has not been found.

■ Defendant calls attention to the presumption that if a will which was last seen in the possession of the testator cannot presently be found, it must be presumed, in the absence of other evidence, that the testator destroyed and revoked the will. *Miller's Will*, 49 Or 452, 456, 90 P 1002, 124 Am St R 1051 (1907). Plaintiff acknowledges the presumption but contends that it is overcome in this case by the circumstances and other proof to the contrary.

The Oregon Supreme Court in *McCoy's Will*, 49 Or 579, 90 P 1105 (1907), said:

"It must, we think, be taken for granted, therefore, that the will when last seen was in the custody of the testator, and since it could not be found after his death a legal presumption is raised that it was destroyed by him with the intention of revoking it, and the burden of proof is on the proponent to overcome this presumption * * *. This presumption is said, by the Supreme Court of New York, to be a strong one and to stand in the place of positive proof: Collyer v. Collyer, 110 N. Y. 486 (18 N. E. 110: 6 Am. St. Rep. 405). It is, however, but a *prima facie* presumption, and may be overcome by circumstances or other proof to the contrary." 49 Or at 581-82.

In the *McCoy* case the court found that the will had been revoked. There was evidence of positive declara-

tions by the testator that he had, in fact, destroyed and revoked the will.

In the more recent case of *Van Vlack et al v. Van Vlack*, 181 Or 646, 182 P2d 969, 185 P2d 575 (1947), one bearing many similarities to the present one, there was uncontradicted evidence of the execution of a will and of its having been placed in a safety deposit box. The testator had access to the box and after his death the contestant of the will inventoried the box. Part of the time, while the box was open, the taking of the inventory was unsupervised. No will was found in the box. After citing the general rule quoted above from *McCoy*, the court said:

> "We think that anyone, whether he be a judicial officer or a layman unschooled in the law, would infer that a decedent had evidently destroyed his will when, after death, the will could not be found in the repository in which he had placed it and over which he exercised control. The strength of the inference obviously would be dependent upon the control which the decedent possessed over the repository and the access which others had to it. From 2 Page on Wills, p. 720, § 873, we quote:
>
>> " 'If the will is not in the custody of testator, but he has ready access to it, there is a greater chance that it may have been destroyed by someone other than testator; but the courts apparently feel that the chances in favor of its destruction by testator are greater than the chances in favor of its unlawful or criminal destruction by another; and the presumption that testator destroyed it with the intention to revoke it exists.'
>
> "We deem it unnecessary to determine whether the word 'presumption' or the word 'inference' is the correct one to identify the assumption drawn from the facts to which we have been alluding. If

the assumption is a presumption of law, that fact would not prevent the mind from drawing from the same circumstances an inference that the decedent destroyed his will. Presumptions and inferences are often companions and frequently are based upon identically the same facts; the one is a creation of the law and the other is a conclusion drawn by the reasoning faculties. The only issue before us, as we shall presently show, is whether the assumption has been overcome and, therefore, we deem it unnecessary to determine its true character. * * *" 181 Or at 657-58.

The court in *Van Vlack* went on to conclude that the inference or presumption had been overcome by the decedent's statement, made three or four weeks before his death, to a bank officer that the bank officer was the decedent's executor, which was consistent with the terms of a copy of the missing will.

The court in *Van Vlack* pointed out that the strength of the presumption or inference that the will has been revoked is

"* * * dependent upon the control which the decedent possessed over the repository and the access which others had to it. * * *" 181 Or at 658.

In the present case there was no positive proof as to the place where the will was kept. It was probably placed by the decedent either in his safety deposit box, which he entered on the day the will was executed, or in his home. The defendant, whose interests would be adversely affected by the will, had access to both the safety deposit box and the home. Though we impute no improper conduct to the defendant, the very fact of his access weakens the presumption of destruction by the testator.

"* * * No one claims that anyone fraudulently

or wrongfully removed anything from the box, and, clearly, we would not be justified in believing that the will disappeared in such a way. * * *" *Van Vlack et al v. Van Vlack*, supra, 181 Or at 659-60.

3 Page on Wills, Bowe-Parker Revision, § 29.142, states at 706:

> "The fact that a disinherited heir had an opportunity to destroy or cancel the will is not of itself sufficient to rebut the presumption that testator destroyed it, canceled it, and the like. Even where there is an opportunity for the disinherited heirs to destroy the will, together with a motive, the commission of a crime will not be presumed. *The fact that disinherited heirs, or other persons, had access to the will may be considered in determining the issue of revocation, and, in connection with other facts, may be sufficient to rebut the presumption that testator destroyed it.*" (Emphasis supplied.)

Here the decedent had been testate since 1952. In each of the several wills he had specified the bank as executor. He had sought out the plaintiff to advise him of their relationship and of his intention to make him the object of his bounty. There is nothing in the record to suggest a change of heart by decedent as to any of the foregoing objectives.[2] At no time, to anyone, did decedent suggest he had revoked or canceled his will. While subject to scrutiny on account of his interest, the testimony of Fry that decedent mentioned the will to him on his last visit with him in the hospital in October 1968 is entitled to consideration. If the will was then in Condon, as the probabilities indicate, decedent did not thereafter have access to it

---

[2] See Salter v. Salter, 209 Or 536, 307 P2d 515 (1957), where there was substantial evidence of an intent by the testator to change his will.

and if it was destroyed, misplaced or lost subsequently, it was not by the testator's act.

■ We hold that the proponent of the will has carried his burden of proof; that the prima facie presumption of destruction has been overcome by evidence which satisfies us that the will was not revoked by the testator.

In so holding we are not disregarding the carefully considered opinion of the trial court that the presumption of revocation was not overcome by the evidence to the contrary. We review de novo. On issues involving credibility we give its findings weight. However, we do not agree with the trial court on the weight to be accorded the presumption where control and access were as here, and where the "circumstances and other proof to the contrary" are as we have delineated above.

Reversed and remanded with instructions to admit the will to probate.